SCHROEDER, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 17, 1932—February 7, 1933.*

For the plaintiff in error there were briefs by *Swietlik & Burns* of Milwaukee, and oral argument by *Geo. A. Burns* and *F. X. Swietlik*.

For the defendant in error there were briefs by the *Attorney General, George A. Bowman,* district attorney of Milwaukee county, *Walter J. Hofer,* first deputy district attorney, and *Oliver L. O'Boyle,* corporation counsel, and oral argument by *Mr. Bowman* and *Mr. Hofer.*

The following opinion was filed October 11, 1932:

FRITZ, J. On a trial by jury, the fact that the defendant was a director, the president, and virtually the managing officer of the Franklin State Bank since 1925 was established beyond room for dispute. Likewise, it was established that the deposits specified in the information were received and accepted on June 16, 1931. The major issues on the trial were whether the bank was then insolvent, and whether the defendant then knew or had good reason to know that the bank was then unsafe or insolvent.

As to when a bank is insolvent within the meaning of that term as it is used in sec. 348.19, Stats., this court held in *Ellis v. State,* 138 Wis. 513, 119 N. W. 1110:

"A bank is unsafe or insolvent . . . when the cash value of its assets realizable in a reasonable time, in case of liquidation by its proprietors, as ordinarily prudent persons would ordinarily close up their business, is not equal to its liabilities, exclusive of stock liabilities."

The opinion filed in that case demonstrates that the rule, as thus stated, was the result of careful consideration of the problems involved from the standpoint of the banker, as well as of the depositors and the state at large. It has since been

approved and followed, as in *Sprague v. State,* 188 Wis. 432, 206 N. W. 69, without any modification by this court or the legislature. Even in the present financial crisis, with the realizable values deflated to a most extraordinary extent, there has been no legislative action to change that rule, or otherwise amend sec. 348.19, Stats. On the contrary, when the legislature last convened in a special session to deal with the difficult problems occasioned by the current financial depression, it substantially adopted that rule in defining in sec. 7 of ch. 10, Sp. Sess. Laws of 1931–32 (repealed by sec. 1, ch. 15, Sp. Sess. Laws 1931–32), the realizable value to which the commissioner of banking may require a bank to reduce the book value of any asset carried on its books. In that connection, the legislature somewhat enlarged upon the statement of the rule by expressly specifying certain elements which are to be taken into consideration in determining the realizable value, but those elements were all relevant, material, and consequential under the rule as stated in the *Ellis Case;* and, in that respect, the legislative enactment is rather declaratory and not in derogation, or even modification, of that rule.

After carefully reconsidering that rule and the problems that the entire subject matter involves, particularly under such unanticipated and distressing circumstances as are affecting values in these times, we have concluded that the rule as laid down in the *Ellis Case* is as reasonable and fair to all concerned, and is as well and precisely stated, as the circumstances permit. When the issue as to the solvency of a bank depends upon the realizable value of some of its assets, which are of such nature that it is uncertain, in point of fact, whether they can be converted, within the time and under the circumstances stated in the established rule, into the amount of money essential to avoid insolvency, then, in so far as solvency is dependent upon the realizable value of

those assets, that issue is not merely a question of law. Under those circumstances, the determination as to whether a bank is insolvent, whenever that issue arises in a prosecution under sec. 348.19, Stats., involves questions of fact as to which there can be no definite or conclusive determination until that issue of fact is ultimately decided by a jury or an authorized trier of issues of fact.

Whether the evidence was sufficient to convince the jury, beyond a reasonable doubt, that the Franklin State Bank was insolvent on June 16, 1931, depends in the final analysis upon whether the amounts at which it carried on its books its loans and discounts, viz. $627,890, and its investments in bonds, viz. $258,503, in fact exceeded the realizable value of those assets to an extent that was in excess of its capital structure (including its capital stock, surplus, and undivided profits), which amounted to $136,908.41. The state contends that the evidence warranted the jury in finding that the amounts at which those assets were carried on the bank's books exceeded the realizable value of those assets to the extent of at least $195,804 on its loans and discounts, and $92,266 on its security investments. If that contention is correct, then the deductions necessary in relation to those assets exceeded its capital structure to such an extent that the bank was clearly insolvent.

In regard to the loans and discounts, a review of the evidence discloses that there was ample proof to warrant the jury in finding that the losses on those assets were as follows:

$28,179.16 on loans which were not secured, and $39,392.30 on loans which were not well secured; and as to all of which interest was due and unpaid for at least twelve months, and there were no pending proceedings for collection. By reason of those facts alone, those debts were presumably bad and should have been charged off as a loss un-

der sec. 221.36, Stats. It was not incumbent upon the state to also prove that the debtors were insolvent. As was said in *Sprague v. State, supra:*

"When the state upon the trial established that fact, it made a *prima facie* case of insolvency of the bank. The defendant was not concluded by such a showing and could have shown the true value of the items. . . . If, in addition to proving that the bank could not realize upon the items classified as 'bad debts,' the state had to prove that the debtor was likewise insolvent, a burden would be cast upon the state which it could scarcely sustain."

However, in the case at bar, in addition to establishing the facts that rendered that statutory presumption applicable, there was sufficient evidence otherwise to establish that those loans were a total loss.

$108,232.99 additional losses will be sustained on certain secured and unsecured loans, aggregating $139,250.26, which, while they were not *prima facie* bad solely by virtue of sec. 221.36, Stats., were proven to be of such uncollectible character that a loss of at least $108,232 will be sustained thereon. Discussion here of the details as to each of those loans will serve no useful purpose.

After due consideration of the evidence in relation to those three classes of loans and discounts, we are convinced that the amount at which they were carried on the bank's books does exceed the realizable value thereof by at least $195,000. As that item alone is in excess of the bank's capital structure of $136,908 by more than $58,000, the bank was insolvent to at least that extent, without taking into consideration any deductions because of excessive valuations in its security investment account.

As to the bank's investments in bonds, the state contends that $4,167 of the amount at which that account was carried on the bank's books should have been charged off as a write-up loss, upon the substitution of certain securities of lesser value and cost, for certain depreciated securities, which it had

originally owned and carried in that account at $6,000. That contention is warranted by the evidence. However, of greater significance is the state's contention that on June 16, 1931, that account as to its investments in bonds was carried on the bank's books at an additional sum of $88,099, in excess of the value realizable upon those assets under the established rule. In support of that contention, the state relied primarily upon the testimony of two witnesses, qualified to testify as experts on the subject, who testified as to what was, in their opinion, the reasonable market value of such of the bonds as to which market quotations in June, 1931, were published in the standard publications. In relation to bonds as to which such quotations were obtainable, and on the basis of such quotations, one of those witnesses, Loewi, testified that the market value of bonds carried on the bank's books on June 17, 1931, at $192,854.45 was then only $110,936, or $81,918.45 less than the amount at which the bank carried them; and the other witness, Pitman, who, as an examiner of the state banking department, had appraised the assets on June 8, 1931, testified that the market value of the bonds then carried on the bank's books at $203,701.95 was only $115,148, or $88,553.95 less than the amount at which the bank carried them. The defendant contends that testimony based merely on current market quotations is incompetent and insufficient to establish the realizable value of such securities. However, under the authorities, when it is proven, as was done in the case at bar, that at the time in question there was a market value as to the particular stocks or bonds which are involved in litigation, and that market quotations as to such value were currently published in standard publications, proof of such market value of such securities is undoubtedly evidence bearing on the question of its real value, although it is not conclusive. *Warner v. Benjamin,* 89 Wis. 290, 295, 62 N. W. 179; *Heiner v. Crosby,* 24 Fed. (2d) 191; *Henry v. North American Ry.*

*Constr. Co.* 158 Fed. 79. In the case last cited the court rightly said:

"Where a given article or commodity, or stocks and bonds, . . . have been sold in the market, . . . this may be shown as a means of fixing the value . . . ; but even this market value may not be conclusive in the sense of a conclusive legal presumption. It stands as a criterion of value because it is a common test of the ability to purchase the thing. In such cases what is called the 'market price,' or the quotations of the articles for a given day, is not the only evidence of value. The true value may be drawn from other sources."

That rule was applied and followed, in all respects, on the trial of this case. The testimony of Loewi and Pitman, based upon the market prices or quotations, was held admissible to establish, *prima facie,* the value of the bonds as to which they testified. However, that evidence as to value was not treated as conclusive proof of the realizable value. The defense was freely permitted to introduce the testimony of its financial expert, Mulvaney, as to recognized classifications and ratings of the securities, and his system of fixing intrinsic or true value by plant valuation, average earnings, management, and other elements which he detailed as going to make up the intrinsic value of a bond. On the other hand, he also described the effect of current financial conditions upon the bond market, and testified that fictitious prices for securities are frequently created by various means, and that in view of the present depression a reasonable time to liquidate the list of bonds held by the bank on June 17, 1931, would be upwards of three years. His testimony would have afforded some basis for the jury to find that the bank's book value of the bonds in question did not exceed their realizable value. All of that testimony was equally admissible, but likewise not conclusive proof as to the realizable value of those securities. While the market value, in theory at least, ought perhaps to reflect or coincide with the intrinsic value of a bond, including the property pledged as security there-

for, if nevertheless, because of current economic or financial conditions, which during the time permissible for liquidation affect the salability of securities, their market value is not in conformity with their intrinsic value, then all that can, after all, be realized therefor is the market value. That alone, under such circumstances, may constitute the reliable although not the conclusive criterion as to the realizable value.

After the defendant introduced Mulvaney's testimony, including his conclusions as to the value realizable within the probable period of liquidation, in view of the intrinsic values, prior earnings, and other elements testified to by him, the state in rebuttal was permitted, over objection, to introduce evidence tending to prove a general, continuous downward trend of market values from June, 1931, up to the time of the trial in June, 1932; but it was not permitted to prove the exact amount of the depreciation in values of any of the bonds within that period. That evidence in rebuttal was properly received and was of consequence in so far as the actual downward trend of prices, which was experienced in the bond market during that year, tended to impair and refute Mulvaney's theories as to the values which he had testified would be ultimately realizable by reason of the intrinsic value, earnings, and other elements which he had considered of greater significance than the current market values.

The defense also challenges the sufficiency of the proof to establish beyond a reasonable doubt that at the time of receiving the deposits on June 16, 1931, the defendant knew or had good reason to know that the bank was unsafe or insolvent. The evidence well warrants the conclusion that the defendant, as president of the bank, was actively engaged in managing and dominating all of its affairs. As is conceded in defendant's brief, the president of a bank, who is active in the conduct of its business, is chargeable with knowledge of its financial condition. That conclusion was clearly ap-

plicable under the facts in this case. In relation to the defendant's knowledge as to the unsafe or insolvent condition of the bank there was, in connection with considerable other evidence, which it was within the province of the jury to accept as convincing on that subject, proof of the following significant facts: From 1925 to 1931 a number of official communications from the state banking department, which the defendant received, repeatedly admonished the bank as to the bad character of some of its loans and the low grade of an unduly large percentage of its bonds. Nevertheless, the bank continued to carry some of them as part of its assets, and at the same valuation. Finally on November 6, 1930, the commissioner of banking told the defendant, "Your bank is insolvent and it is my plain duty to close it up." At that time the bank· was permitted to continue because the defendant furnished a bond to protect, to the extent of $30,000, the bank's patrons, customers, depositors, and creditors until such time as a new issue of stock of the bank was sold. In that connection the commissioner gave directions for the improvement of the financial status of the bank in a number of respects, but most of them were never complied with by the defendant. On June 13, 1931, the cashier informed the defendant that on June 12, 1931, a state bank examiner, who was then examining the bank's affairs, had notified him that there were depreciations of $90,000 in the bank's bond account, and $70,000 because of bad loans in its loans and discounts account; and that if he felt the bank was insolvent, he should lay the cards on the table and write a letter to the commissioner of banking. In reply the defendant said in relation to writing such a letter, "You better hold off." At the opening of the bank on June 17, 1931, the defendant issued directions to the cashier to segregate all deposits received on that day (which was the day on which it was subsequently closed by a vote of its directors). However, in that connection, the depositors were not informed that their de-

posits were not to be credited to their accounts as usual, and the money and checks deposited by them were in fact commingled with other funds, and there was no attempt at segregation otherwise than the listing of those deposits on special sheets. While the proof as to the segregation, by separate listing, of deposits on June 17, 1931, may on the one hand indicate the commendable intention of according some special protection to those depositors, it, on the other hand, also admits of the inference that occasion for affording such protection was considered by the defendant to exist, because of his knowledge as to the insolvency and impending closing of the bank. At all events, the above mentioned and the other facts and circumstances of like import warranted finding that the defendant on June 16, 1931, knew or had good reason to know that the bank was unsafe or insolvent.

Likewise, as to all of the other assignments of error, we find no basis for reversal. The excerpts from letters written between 1925 and 1931 by the state banking department to defendant's bank, which were used during the cross-examination of the defendant to confront him with written evidence of matters of which he disclaimed knowledge, were admissible to prove timely notice to him, and knowledge on his part as to the bad character of certain loans and the low grade of an unduly large percentage of its securities. The credibility of the testimony of the witness Rothstein was after all a question for the jury, notwithstanding the manner in which the defense claims he was discredited by his own contradictions and his testimony as to questionable transactions. Because of those matters, it was within the province of the jury to discount the weight of his testimony, but the court could not, because of those matters, entirely exclude his testimony from the consideration of the jury. Likewise his testimony that a loan for $15,487 to the A & B Realty Company was not well secured by mortgages on two farms presented a jury question as to the merit and weight of his

opinion as well as to his credibility. Although he was not proven to be qualified to testify as an expert witness on farm values in the particular locality, it did appear that he had been delegated by the bank to inspect the farms as the security for the loan, and that he had then found them vacant, abandoned, and neglected, with the buildings in a dilapidated and uninhabitable condition. The facts thus observed and testified to by him qualified him sufficiently, at least, to permit him to testify that, with the farms in that condition, they did not well secure the mortgage loans. But, on the other hand, in view of all of the other uncontradicted evidence on the subject, Rothstein's testimony as to the security afforded by those farms was of so little additional consequence that it is wholly improbable that the defendant was actually prejudiced thereby.

The proof as to the total amounts of the daily deposits on June 15, 16, and 17, 1931, was not prejudicial, inasmuch as the bank's books of account had been received in evidence by stipulation, and each of the totals was but a summary of what was already in evidence in detail by reason of the admission of the books. At all events, as there was no contradiction on the trial of the receipt by the bank of the deposits as specifically charged in the information, the mere proof as to the total amount of the deposits added nothing detrimental to the defendant on any matter in dispute.

The alleged misconduct of the juror Hannah Fritsche, in failing to more fully disclose the facts as to her acquaintanceship with the witness Rothstein, appears to have been thoroughly investigated and considered by the learned circuit judge. The proceedings demonstrate that he well realized that—

"Every suitor is entitled to have his case tried before an impartial forum. Every effort should be made to avoid any reason for suspicion on the part of a suitor that he has not

had a fair and impartial trial." *Maahs v. Schultz,* 207 Wis. 624, 242 N. W. 195, 200; *La Valley v. State,* 188 Wis. 68, 79, 205 N. W. 412.

Accordingly, when the defense contended, on motions after verdict, that Hannah Fritsche had not fully disclosed the frequency and the friendly character of her associations with Rothstein, although she had freely stated on her *voir dire* that she was acquainted with him, and had met him on two occasions, the court promptly permitted all witnesses on that subject to be interrogated fully in the open court. At the conclusion of a thorough investigation the court found—

"that this juror was guilty of no misconduct whatever; is entitled to a full exoneration from the charges made; and made a full and fair disclosure of all facts touching which she was asked upon *voir dire;* . . . that sufficient facts were at that time disclosed to arrest the mind of an examining counsel and prompt him to exercise one of the four peremptory strikes given by statute, and that the slight additional matter disclosed upon this present hearing as to another casual meeting of no moment would not have served to more plainly arrest the attention of the examiner, nor would it have a greater inducing force to prompt a strike. All in all, the court is satisfied the jury was fairly selected and deliberately accepted with full knowledge of all material facts."

As the record fully warrants those findings and conclusions, the alleged misconduct affords no basis for a new trial.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, without costs, on February 7, 1933, and the following memorandum was filed February 27, 1933:

PER CURIAM. On February 24, 1933, the plaintiff in error filed a petition in which he asks the court to vacate the order denying the motion for rehearing, made February 7,

1933, and grant leave to petitioner to file a supplemental brief and argument setting forth facts and law in support of assignments of error. The assignments of error proposed raise questions with respect to the constitutionality of the statute under which the plaintiff in error was prosecuted and seek to reargue and have reinvestigated matters considered and passed upon in the original decision of the court. The motion for rehearing having been denied on February 7, 1933, it is the duty of the clerk, within twenty days thereafter, to transmit the record to the court from which the appeal is taken. Sec. 274.35, Stats.

The petition was in effect an *ex parte* application for a rehearing of an order made denying a rehearing and therefore within the rule laid down in *Tomberlin v. Chicago, St. P., M. & O. R. Co.* 208 Wis. 30, 238 N. W. 287, 242 N. W. 677, 243 N. W. 208, and cases cited, and therefore one not to be entertained under the established rules of this court. Furthermore, the principal question sought to be raised, if the petition to set aside the order denying the rehearing were granted, relates to the constitutionality of the statute upon which the prosecution is based. Under the provisions of sec. 355.09, Wis. Stats., such questions must be raised by objection to the information and if not so raised are deemed waived.

Other questions sought to be raised are presented by the record and were not raised by counsel in presenting the appeal or upon the motion for the rehearing after the affirmance of the judgment by this court. The questions sought to be raised by the petition not having been presented within the time prescribed and in accordance with the rules of court, cannot be considered and the petition is dismissed.