Rosenberg, Plaintiff in error, vs. The State, Defendant in error.

*June 19—September 12, 1933.*

For the plaintiff in error there were briefs by *William E. Burke,* attorney, and *Irving A. Fish* and *Lyman G. Wheeler* of counsel, all of Milwaukee, and oral argument by *Mr. Fish* and *Mr. Burke.*

For the defendant in error there were briefs by the *Attorney General, William A. Zabel,* district attorney of Milwaukee county, *Fred M. Wylie,* deputy district attorney, and *Edward J. Yockey,* first assistant district attorney, and oral argument by *Mr. Wylie* and *Mr. Yockey.*

The following opinion was filed June 29, 1933:

FAIRCHILD, J. Among the contentions made by plaintiff in error against the judgment entered in the municipal court the principal one is that there was no proof of the *corpus delicti,* that is, the falsity of the statements published. A consideration of the facts with respect to the publication becomes necessary in treating this proposition. At times during the years 1929, 1930, and 1931, the state banking commissioner called to the attention of the officers and directors of the Liberty State Bank the weakness of the bank with respect to its lack of liquidity, the large amount of demand liabilities and bills payable, and its very weak cash condition, and demanded the strengthening of the bank. The practice of the banking department under the provisions of sec. 221.15, Stats., was to call every three months for a statement of the bank's condition. This practice was known to plaintiff in error, who also knew when such calls were likely to be made. Anticipating a call at the end of June,

1931, plaintiff in error told his cashier that the bills payable would have to be reduced on the call statement and that in order thus to reduce them, he, plaintiff in error, proposed to have transferred to him some $200,000 in amount of the receivables of the Liberty State Bank to borrow on his note from the First Wisconsin National Bank $200,000, using the receivables as collateral to the note. The proceeds of this note he intended to use to reduce in a corresponding amount the notes payable of the Liberty State Bank at the First Wisconsin National Bank, and that after the date of the call he would again transfer the receivables to the Liberty State Bank, which would, in turn, pay plaintiff in error's note at the First Wisconsin National Bank by giving the First Wisconsin a new note in like amount, thus returning everything to the former status, including the amount of bills payable of the Liberty State Bank. He instructed the cashier to enter the first part of the manipulation on the books of the bank as a completed and unconditional purchase of the receivables of the bank and to make out the called-for statement accordingly. After the call date the transaction was to be recorded as a repurchase by the Liberty Bank of its receivables under a new loan by the Liberty Bank. This plan was carried out and on June 29th the bills payable of the Liberty Bank were reduced on its books by $205,850. According to the practice of the bank when a note was paid or sold, the note was entered in a register under the heading "Date paid." No such entries were made as to the notes so transferred to plaintiff in error on June 29th, because the notes were to come back into the bank's possession.

On each of four subsequent occasions at the end of each quarter, like directions were given to the cashier by the plaintiff in error and carried out with the express purpose of reducing the bills payable of the Liberty Bank on call statements published in newspapers. A tabulation showing the five manipulations appears on page 438.

| True amount of bills payable. | Reported amount of bills payable. | Amount of the falsification. | Day when the bills payable were reduced. | The call date. | Day when the bills payable were returned to true amount. | Day when the call statement was signed. | Day when the call statement was published. |
|---|---|---|---|---|---|---|---|
| $320,000.00 | $114,150.00 | $205,850.00 | June 29, '31 | June 30 | July 3 | July 7 | July 8 |
| 404,422.10 | 198,197.10 | 206,225.00 | Sept. 25, '31 | Sept. 29 | Oct. 6 | Oct. 8 | Oct. 9 |
| 440,020.00 | 230,000.00 | 210,020.00 | Dec. 30, '31 | Dec. 31 | Jan. 5, '32 | Jan. 5 | Jan. 8, 9 |
| 399,300.00 | 119,300.00 | 280,000.00 | Mch. 23, '32 | | Apr. 1 | | |
| 425,300.00 | 154,182.65 | 271,117.35 | June 30, '32 | June 30 | July 1. | July 6 | July 7 |

The foregoing tabulation indicates the scope and effect of the transactions.

Plaintiff in error directs attention to the fact that the offense charged is the publishing of a false report; that the falsity of the report is the substantive feature of the offense and an absolute requisite for conviction, and he contends that these transactions were genuine, had legal effect, and were correctly reported. It is the position of the plaintiff in error that his intent is of no consequence so long as the report itself is not false. Examined a little more in detail, it is his claim that the first part of the transaction resulted in no liability to the Liberty State Bank for the reason that the bank in no way guaranteed plaintiff in error's loan, and for the further reason that there was no liability of the Liberty State Bank to repurchase. This leads to the conclusion that there was an actual decrease in the bills payable of the Liberty State Bank without any corresponding liability. He denies that there is any evidence of a repurchase agreement, although it is conceded that plaintiff in error said that the bank would have to repurchase the loans and that they were repurchased after the call date. There is a further contention that the cashier had no authority under the doctrine of *Hawkins Realty Co. v. Hawkins State Bank,* 205 Wis. 406, 236 N. W. 657, to repurchase the loans, and that had the agreement been made it would be void. This results in claiming that on each occasion when the process was reversed and·the receivables returned to the bank, the transactions were wholly ineffective and did not in law restore the *status quo.*

Briefly summarized, the arguments amount to this: that the transaction was one which had the legal effect of reducing the liabilities of the bank, and that while there may have been a wrongful intention to restore the *status quo* after the call date, that intention could not have been effected as a matter of law, and that regardless of the intention the entries in the published statement represented the true condi-

tion of the bank. The state takes the position that the transactions were merely colorable; that the manipulations of plaintiff in error were for the purpose of presenting to the public a false picture of the financial condition of the bank, and that he accomplished this effect.

We are unable to escape the conclusion that the state's position is sound. It may contribute to the adequacy of the discussion to note that older as well as more recent cases involving analogous situations sustain the prosecution. In *Peek v. Gurney*, L. R. 6 H. L. 377, 386, it was said:

"It cannot be denied that if the condition of the firm of Overend & Gurney had been disclosed the result must have been their stoppage, and no hope could have been entertained of establishing a joint stock company upon the basis of a concern in such a state. The foundation of the projected company was therefore necessarily laid in concealment; and to render the scheme attractive to the public the promoters were not only compelled to hide the truth, but to give such a color to the statements put forth in the prospectus as to render them (though perhaps literally true), yet, in the sense in which they must have known the statements would be understood by the public, really false."

This same case is also authority for the proposition that there must be some active misstatement of fact, or at all events such a partial and fragmentary statement of fact, as that the withholding of that which is not stated makes that which is stated false. In *Gluckstein v. Barnes*, [1900] L. R. App. Cas. 240, 250, it was said:

"It is a trite observation that every document as against its author must be read in the sense which it was intended to convey. And everybody knows that sometimes half a truth is no better than a downright falsehood."

In *Aaron's Reefs, Ltd. v. Twiss*, [1896] L. R. App. Cas. 273, 281, a case dealing with an alleged fraudulent prospectus, it was said:

"It is said there is no specific allegation of fact which is proved to be false. Again I protest, as I have said, against

that being the true test. I should say, taking the whole thing together, was there false representation? I do not care by what means it is conveyed—by what trick or device or ambiguous language: all those are expedients by which fraudulent people seem to think they can escape from the real substance of the transaction. If by a number of statements you intentionally give a false impression and induce a person to act upon it, it is not the less false although if one takes each statement by itself there may be a difficulty in showing that any specific statement is untrue."

In another recent English case, [1932] L. R. 1 K. B. 442, arising out of the affairs of the Royal Mail Company, Lord Kylsant, the chairman of the company, on whose behalf a prospectus had been issued, was adjudged guilty of violation of a section of the Larceny Act; the statements in the prospectus were true but did not constitute a whole truth, and thereby there was given a false impression of the company's position; and this case, *Rex v. Kylsant,* is authority, if such is needed, for the doctrine that a written statement is made false not only by reason of what it stated, but also by reason of what it omitted to state, or what is concealed or implied.

While it is true the transaction brought with it certain legal consequences such as liability of plaintiff in error to the First Wisconsin National Bank, the discharge of the liability of the Liberty Bank upon its notes to the amount of the loan and the transfer of receivables to plaintiff in error were acts at least as colorable as the typical transfer in fraud of creditors. It was made for the purpose of creating an appearance of financial soundness that was substantially false. It was plainly a manipulation intended to have no legal effect as between plaintiff in error and the Liberty Bank; as to them it was a mere paper transaction made for the purpose of justifying the publication based upon it and then immediately to be canceled. The statement published was as false as though the transaction had never taken place,

and the fact that its illegality might make it impossible for plaintiff in error to insist upon a restoration of the *status quo* in no way affects this conclusion. The grantor of a fraudulent conveyance, when he seeks to recover the property fraudulently conveyed, is met with the rule that precludes his recovery and treats the transfer as valid between him and the grantee. Legal relations do sometimes result from a merely colorable transaction. We think it cannot fairly be concluded, assuming the criminal prosecution of a fraudulent grantor, that he could have any defense based upon the validity of a transaction as between himself and his grantee. Whatever consequences the civil branch of the law imposes as a punishment, it does not preclude inquiry into the transaction by the criminal law to ascertain its true import and effect. Taking each step made by plaintiff in error by itself, it may be that he was well within his rights in borrowing money, in purchasing the receivables, but it is the result which he organized and placed in the report for publication that we are concerned with, and we cannot believe that it was the intention of the legislature, in providing for the publication of reports of banks to the public, and penalizing the making of false reports, that sham or colorable manipulations might with impunity be made the basis of book entries and reports.

It is our conclusion that the statement published by the plaintiff in error is false because it records and publishes, as reflecting a true condition of the bank, a transaction between him and the bank which was sham or colorable, the character of which is indicated by the fact that on each of the occasions involved the transaction was reversed by plaintiff in error and the *status quo* as of a time prior to the call date completely restored.

Plaintiff in error in support of his contention relies on *Coffin v. United States,* 156 U. S. 432, 463, 15 Sup. Ct. 394, and *Hayes v. United States,* 169 Fed. 101. In the *Coffin*

*Case,* in the course of criticizing instructions given by the trial court, it was said:

"We think it is clear that the making of a false entry is a concrete offense which is not committed where the transaction entered actually took place, and is entered exactly as it occurred."

In *Hayes v. United States, supra,* the court said:

"It may be conceded that if the officers of a bank procure a note to be given to the bank by an irresponsible person, with the intent of apparently, but not really, magnifying the bank's assets, and should thereafter make an entry in a report required by law to be made to the comptroller of the currency, including such note as a *bona fide* asset of the bank, with either of the intents denounced by sec. 5209, such an entry, even though of a paper in actual existence, would be a false entry, within the meaning of sec. 5209. This, we think, would not contravene the doctrine of *Coffin v. United States,* 156 U. S. 432, 15 Sup. Ct. 394, 39 Lawy. Ed. 481, and other like cases. But such concession does not help the government in this case. There was no substantial testimony tending to show that the note here involved as the subject of the false entry was any such sham affair as stated in the concession just made."

The *Hayes Case* just quoted from related to a note given to the bank for the accommodation of certain of its officers. The court held that it was not a sham transaction, "or that there was any understanding between him (maker) and the officers of the bank that he should not be held on the note." It is evident from the very words of the opinion that the court did not consider what was said in the *Coffin Case* to be applicable to a sham transaction.

In *United States v. Warn,* 295 Fed. 328, a note made without consideration for the purpose of concealing an excess loan to another patron of the bank was under consideration, and the court said:

"Here the gist of the charge is that the note, entered as alleged, was 'a mere dummy,' etc., and the whole question

of the sufficiency of the charge turns upon the meaning to be attached to the word 'dummy.' However inelegant the term, it has undoubtedly come into common use. We speak and hear of 'dummy' directors of a corporation, 'dummy' entrymen in connection with public land frauds, 'dummy' contracts, etc. In its general significance it is perhaps more comprehensive and less distinctive in meaning than other words which might be named as its synonyms. 'Sham' is possibly the closest equivalent. It implies a make-believe, a pretended, a feigned something—an imitation, a counterfeit in a general sense, but not necessarily fictitious or forged. If, as I take the term 'dummy' here to mean, the Streeter note was a mere sham, a mere make-believe note, and the defendant knew such to be its character, he could not rightfully carry it as a real asset of the bank, and entries purporting to exhibit it as such would be false."

In the case of *United States v. Darby,* decided April 10, 1933 (53 Sup. Ct. 573, 77 Lawy. Ed. 677), the following statement appears:

"The crime of making false entries by an officer of a national bank, with the intent to defraud, includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or defraud the association."

In *United States v. Morse* (C. C. S. D. N. Y.) 161 Fed. 429, the court said (p. 436):

"It is obvious enough that 'it cannot be a false entry to make a recital on the books of the bank which speaks the truth' (*United States v. Young* (D. C.) 128 Fed. at page 115), but the sort of truth referred to must be of legal standard; i. e. the whole truth, and nothing but the truth. It may be the truth that there was a note; but, if the note was 'fictitious,' it is not the whole truth to recite or record or enter it as a genuine note. There is a difference between a false record and the record of a falsehood."

In 162 U. S. p. 664, 16 Sup. Ct. 943, there is the second case entitled *Coffin v. United States,* and this case together with *United States v. Corbett,* 215 U. S. 233, 30 Sup. Ct.

445

81, support the conclusion we have reached and somewhat qualify the statement contained in the first *Coffin Case.*

Plaintiff in error may have had no intent by his conduct either to wreck the bank or to defraud creditors, but this is of no legal materiality. It is entirely possible that in what he did he was acting under the impression that the depositors must not be alarmed, and that, if they were, their interests and those of the bank would suffer from the consequences of a run. But even assuming that this was the motive, it would be of no consequence. The transaction would then amount to a substitution of the judgment of the plaintiff in error for that of the legislator upon the theory that the end justified the means. The result, in our judgment, was a plain violation of the legislative enactment, and we see no escape from the conclusion reached by the trial court upon the falsity of the report. *Farmers & Merchants State Bank v. Perry,* 186 Wis. 93, 202 N. W. 179.

Plaintiff in error challenged the sufficiency of the indictment by a motion to quash, insisting that the indictment stated no facts whatever but that on certain dates the defendant did unlawfully and feloniously knowingly make, state, and publish a false report and statement of the bank.

While the indictment may be meager in its statement of facts when compared with a pleading prepared with more and perhaps the usual formality, it still is sufficient. It does inform the accused that being president and director of the Liberty State Bank, a duly organized, existing, and operating institution in the county of Milwaukee, he did unlawfully, feloniously, and knowingly make and publish a false report and statement of the bank's condition, contrary to the statute. It gives the date of the statement, and the nature thereof, and thus describes the statement required to be made on that day. The nature of an indictment does not differ from that of any other pleading setting up a cause of action. Where a statute prescribes or implies the form of the indict-

ment, it is usually sufficient to describe the offense in the words of the statute. The accusation in the indictment brings the accused within all the material words of the statute. "An indictment is a plain, brief, and certain narrative of an offense committed by any person, and of those necessary circumstances that concur to ascertain the fact and its nature." 2 Andrews, American Law (2d ed.) sec. 904. Under the structure of the statute here under consideration and the rules of pleading prevailing in this jurisdiction, we are impelled to hold that the indictment in question contains all the elements which enter into the composition of the offense and leaves no reasonable ground for mistaking the charge attempted to be set up. The statute, sec. 221.17, contains words sufficiently descriptive of the offense to permit describing it in an indictment in the language of the statute. This section, so far as material, reads:

"Any banker . . . who shall knowingly make, state, or publish any false report or statement of any such bank . . . shall be deemed guilty of a felony, and upon conviction thereof shall be punished," etc.

What was said in the earlier portion of this opinion with relation to the establishing of the *corpus delicti* applies upon the point of the sufficiency of the indictment. The plaintiff in error is charged in several counts with making on a certain date a false statement of the bank's condition on the given dates, not with making false entries therein or doing anything with relation to details thereof requiring particular specification. If the report is false the offense is committed. A bank statement is not an extensive affair. Its purpose is to acquaint the public with the bank's condition. The statute requires a true statement. A statement which gives a result or picture showing the bank substantially stronger than it is in fact is a false statement. As said, this section of the statute does not prescribe penalties for false entries. The statement required is comparatively simple, easily understood by men familiar with banks and business. When one who has

made a false statement is advised by the indictment of the facts detailed, he is advised of the elements of the crime of which he is accused. Plaintiff in error refers us to cases where prosecutions were based on circumstances differing from the facts in this case in nature and detail, cases where the accused was charged with obtaining goods under false pretenses, charged with using abusive and obscene spoken words, as tending to show the necessity of particular specifications in the indictment, but an analysis of these cases we think sustains the holding of the trial court in overruling the motion to quash. *Steuer v. State,* 59 Wis. 472, 18 N. W. 433; *Finsky v. State,* 176 Wis. 481, 187 N. W. 201; *Sprague v. State,* 188 Wis. 432, 438, 206 N. W. 69.

Upon this point we accept the following from the able opinion of the learned trial judge:

"These statutes amply so far individuate the offenses that the defendant has proper notice, from the mere adoption of the statutory terms, what the offenses he is to be held for really are. *Finsky v. State,* 176 Wis. 481, 485, 187 N. W. 201; *Steuer v. State,* 59 Wis. 472, 475, 18 N. W. 433; other cases hereinafter referred to. It is clear that four like statutory offenses under the Banking Act are charged. The time of such offense is explicitly stated. The *Steuer Case, supra,* turned upon the wording and scope of sec. 340.72 (4398), Stats., which fails to individuate the offense to the point here met by sec. 221.17 and sec. 221.15. See *Sprague v. State,* 188 Wis. 432, at pp. 438, 439, 206 N. W. 69, where it was held that the information could refer only to an offense under sec. 221.39, Stats., in the chapter relating to state banks. Here the indictment can refer only to offenses under secs. 221.17 and 221.15 in the same chapter.

"In *Brown v. State,* 127 Wis. 193, 202, 106 N. W. 536, the information was assailed both before plea and after verdict. The subject is exhaustively discussed, many cases are reviewed, and the policy of liberality evinced by various statutes such as secs. 269.43 (2829), 355.14 (4650), 355.22 (4658), 355.23 (4659), and 355.33 (4669), is declared. The conclusion there reached is adverse to the contentions of the defendant in the case at bar. To the same

effect are the cases of *Davis v. State,* 134 Wis. 632, 636, 115 N. W. 150, and *State ex rel. McKay v. Curtis,* 130 Wis. 357, 364, 110 N. W. 189. In the latter case sec. 357.19 (4706), Stats., is also cited as applicable. It is also deemed significant that in both the *Brown* and *Davis Cases, supra,* sec. 355.33 (4669) is also deemed pertinent. That section deals with the sufficiency of indictments or informations, after verdict, where the offense is charged in the words of the statute. Under sec. 355.15 indictments and informations, and all proceedings in the case of either, are in all respects governed by the same rules of law.

"The rules of construction to be applied to the indictment are found in *State v. Brown,* 143 Wis. 405, 127 N. W. 956."

We have considered the claim on the part of the plaintiff in error that his constitutional rights have been ignored, as well as the other questions raised by the able attorneys representing him. We have studied the extensive record, which appears to us to contain ample evidence of an earnest consideration of the rights of the accused on the part of the court and to disclose the diligent and comprehensive effort in behalf of the accused by learned counsel. Impressed with the importance of this case to the accused as well as to the state, we have deliberated upon each assignment of error and have reached the conclusion that the statute under which this prosecution was brought is constitutional; that the accused was duly and sufficiently advised of the offense with which he was charged by a sufficient and proper indictment, that there is ample evidence that accused knew the statement to be false, and that it cannot be disputed that the several statements were made and published by him contrary to the statute. We find no reversible error and the judgment must be affirmed.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on September 12, 1933.