HOBBINS, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 9—March 6, 1934.*

498

For the plaintiff in error there were briefs by *La Follette, Rogers & Roberts,* and oral argument by *Glenn D. Roberts* and *W. Wade Boardman,* all of Madison.

For the defendant in error there was a brief by the *Attorney General, Fred Risser,* district attorney of Dane county, and *E. C. Fiedler* of Beloit, special prosecutor, and oral argument by *Mr. Fiedler* and *Mr. Carl Christianson,* assistant district attorney.

FOWLER, J. The defendant was convicted (I) of knowingly and wilfully causing, while president of the Capital City Bank, a bank organized and existing under the laws of Wisconsin, false entries to be made in the general ledger of said bank in the account with the Marine National Bank, with intent to deceive "any person . . . authorized to examine into the affairs of said bank" contrary to sec. 221.17, Stats.; and (II) of knowingly and wilfully concurring, while president of said bank, a corporation, in the

making and publishing in the Capital Times, a newspaper, of a statement of said bank as of September 29, 1931, false in several designated particulars, with intent to deceive "any member, shareholder or creditor" of said corporation, contrary to sec. 343.37, Stats. The facts so far as essential to an understanding of the decision are stated in connection with the discussion of the several issues raised.

(1) In connection with count (I) the defendant contends that the evidence is insufficient to support conviction because it does not show that the defendant knowingly or wilfully caused the false entries complained of to be made or that the entries were made with intent to deceive "any person authorized to examine into the affairs of the bank." Intent to deceive is an essential element of the offense. If the proof is insufficient as to that element, the conviction cannot stand. In our view of the case we need only consider the contention relating to this intent.

The Capital City Bank was a state depository. The state deposited therein the checks received in payment of automobile license fees. These checks were cleared through the Marine National Bank. Up to a stated period, February, 1924, the Marine National Bank cleared the checks without charge. It then notified the Capital City Bank that in the future it would charge two cents on each check. It thereafter each month mailed the Capital City Bank a statement showing the two-cent charge and the amount to the Capital City Bank's credit on the basis of the deduction. The amount subject to check was plainly the amount thus shown. Notwithstanding this the Capital City Bank in the account on its own books purporting to show the amount to its credit with the Marine National Bank failed to deduct the two-cent charge which in the aggregate amounted to $13,437.60, and thus showed the credit balance greater than it in fact was. The balance shown on deposit with the

Marine National Bank was entered on the Capital City Bank's ledger each day, and each balance entered was a false balance and a false entry.

The evidence shows that the account was so carried on its books by direction of the defendant. He expressly directed the Marine National Bank to continue clearing the checks after being informed that that bank would not clear them unless the charge were allowed, and stated that the amount would be allowed. The reason the balance was so carried on the Capital City Bank books was that the bank expected, or at least hoped, to get the state to allow it the two-cent charge for clearing the checks. It was considered that such allowance could not be procured if the charge were inferentially admitted to be correct by entering credit therefor in the account kept by the Capital City Bank with the Marine National Bank on its own books. Allowance from the state was never procured. The Capital City Bank was closed and its affairs taken over by the Commissioner of Banking, and the false balance was carried on its books until the bank closed.

The statute upon which count (I) is based prohibits false entries with intent to deceive "any person authorized to examine into the affairs of the bank." The persons referred to by the language quoted are the Commissioner of Banking and the examiners of his department.

We are clearly of opinion that any bank examiner examining the condition of the bank would necessarily discover the carrying of the false balance with the Marine National Bank. Statements were sent by the Marine National Bank monthly or oftener, each of which showed the charge for collecting checks and the balance to the credit of the Capital City Bank. These statements were kept in the files of the Capital City Bank. Besides, reconciliation sheets were frequently sent by the Marine Bank, covering items of charge

and credit other than the automobile license checks which were delayed in clearing or collection, and these were also on file. Examination of all state banks by examiners of the Banking Department between stated intervals is required by law. That examiners would discover and examine the statements and reconciliation sheets is manifest. That the defendant, who directed and knew about the carrying of the false balance, could have expected, or even hoped, that these statements and sheets would not be discovered seems absurd. No effort to conceal them from the examiners is shown by the evidence. The examiners were given full explanation of the carrying of the false balances and the reason therefor and they mentioned the matter in their reports. We are of opinion, therefore, that the judgment entered upon count (I) of the information must be reversed with directions to dismiss.

(2) Sec. 221.15, Stats., requires that each state bank shall publish in a newspaper of the city, village, or county wherein it is located, at least three times in each year, reports in form as prescribed by the Commissioner of Banking. The printed statement involved under count (II) is a report of the Capital City Bank required by this section. It is dated October 8, 1931, and refers to the condition of the bank on September 29. Count (II) alleged that this report was to some extent false in practically every respect. We do not consider it necessary to mention each respect in which the statement is claimed by the state to be false, but will consider the following among the items of the bank's assets included in the report: Cash on hand and in reserve banks, which included the $13,437.60 false balance in the Marine National Bank stated above; unpledged bonds reported as $381,653.04, whereas the unpledged bonds were only $38,454, and $356,699.04 of the bonds were pledged, the two making the total of bonds held; loans and discounts, among which were included notes signed by the defendant

as trustee, one for $20,335, to cover its own stock illegally held by the bank and another for $20,138 to cover stock of the Continental Illinois Bank & Trust Company wrongfully held; and overdrafts, which omitted a $4,512.46 overdraft of the King Street Security & Realty Company.

It is claimed that the evidence does not support conviction upon count (II) because it does not show (a) that the defendant knew of the false statements in the publication; (b) that the false statements were wilfully concurred in by the defendant; (c) that the false statements were made with intent to deceive; and (d) that the defendant concurred in publishing the statement.

(a) The facts respecting the defendant's connection with the published report are as follows:

After this report had been prepared and taken to the newspaper for publication, a more detailed report required to be made to the Banking Commissioner covering the condition of the bank at the same time was prepared and presented to the defendant. The defendant insisted on seeing the published report and it was shown to him. Both of these reports were sent to the Banking Commissioner and the defendant insisted on seeing them both before they were sent. He did not ask that any corrections be made in either of them. He did not give instructions to make any statements that would not show the true condition of the bank. It does not appear that he ever examined the books of the bank himself. When he wanted information he asked for it. However, he knew how the books were kept. He had been a bookkeeper himself.

It must be conceded that there is little direct evidence of the defendant's connection with the publication. But he was president of the bank. He knew how the books were kept. He knew that the $13,437.60 item for clearing automobile license checks was included in the item of cash in reserve banks, and knew that that item' as reported was false. He

insisted on having the published statement brought to him. From this it is a fair inference that he read it, and knew of its contents. He must have known—it is a fair inference that he did know—that the item of "unpledged bonds" was false. All but $38,454 of the bonds held by the bank, nearly ninety per cent., were pledged. The report states that all were unpledged—that none were pledged. Surely it is a fair inference—the jury might fairly and properly infer from this—were entirely warranted in inferring from this—that the defendant knew the report in this respect was false. The jury saw the defendant. He was president of the bank. He was drawing $10,000 a year salary for attending to the business of the bank. The matter of pledging ninety per cent., of pledging $356,699.04 of the bonds owned by the bank, is of so great importance as to be naturally called to the attention and to receive the consideration of the president of the bank. Not to infer from all this that the defend-- ant knew of the falsity of this item would be to convict him of utter incompetence and stupidity. The defendant necessarily knew one item of loans and discounts was false because it included the note for $20,335 to the bank signed by himself as trustee. This was in effect nothing but a note of the bank to the bank and in no sense an asset of the bank. The item arose through the bank's buying its own stock, which sec. 221.30, Stats., prohibits. When a stockholder desired to sell this stock, the bank would take it up, carry it in the name of the defendant as trustee, and the defendant would give his note as trustee to the bank. The stock would be held until the bank could sell it. When sold the amount received would be credited on the note or a new note for a reduced amount would be signed by the defendant as trustee. This note was in no sense an asset of the bank. It was in effect a note of the bank to the bank. The real asset which the note was designed to cover and conceal was the bank's own stock. The same may be said

respecting the note of $20,138 signed by the defendant as trustee, respecting which the facts are hereinafter stated in paragraph (4). It also appears from what is hereinafter stated in paragraph (5) that the defendant must have known, and therefore did know, that the item respecting overdrafts was false. There is nowhere in the record any evidence tending to show that the defendant did not know of the statements in the report above referred to or that he did not know of their falsity. We are of opinion that the jury were warranted in finding both knowledge and falsity of these statements.

(b) As to the claim that the defendant's connection with the publication complained of was not "wilful," it may be stated at the outset that if one knowingly commits an act prohibited by a criminal statute he necessarily commits that act wilfully. He is not exempted from criminal responsibility because he considered the prohibition not wrongful. The legislature, in enacting the statute, determined the quality of the act in that respect. *Welch v. State,* 145 Wis. 86, 129 N. W. 656; *Rosenberg v. State,* 212 Wis. 434, 249 N. W. 541, 545. But some of the acts above referred to back of the false publications were by no means innocent in any view. This is true of the reporting of all bonds of the bank as "unpledged" when nearly all of them were in fact pledged. To have published the truth of the matter, that $356,699.04, all but $38,454, of the bonds held by the bank as quick assets were pledged to protect creditors of the bank other than its depositors, would have been to advertise the dearth of security to depositors and to shake the confidence of the depositors in the bank with possible and perhaps probable dire results to the bank. And as to the trustee notes to cover its own stock held by the bank, the main purpose of prohibiting the purchase of stock by banks is to maintain the double liability of stockholders. When a bank purchases its own stock this added liability vanishes and the double

liability of stockholders is evaded. This cannot be considered an innocent transaction. Wilful misconduct necessarily inheres. And so as to the trustee notes to cover the holding of the stock of the Continental Illinois Bank & Trust Company stock hereinafter referred to. It is urged in extenuation that the practice of the bank in these particulars was acquiesced in by the Commissioner of Banking. But this does not obviate the harmful results likely to follow from such practices. It does not convert wrong into innocence. Nor does it relieve from punishment for violations of the criminal statutes. The Commissioner of Banking is not vested with the power of pardon either of past or future violations of such statutes.

(c) The element of intent to deceive inherent in the offense created by the statute upon which count (II) is based is radically different from that involved in the offense stated in count (I). There the person intended to be deceived is "any person authorized to examine into the affairs of the bank." Here the person intended to be deceived is "any member, shareholder, or creditor of the corporation." If a false statement were entirely free from harm in its effect or tendency there would doubtless be no basis for inferring that it was made with intent to deceive stockholders or creditors. But the false statement that $381,653.04 of the bonds of the bank were unpledged necessarily tended to the harm of the bank's depositors and other unsecured creditors, and the necessary tendency of the false publication in that respect was to deceive them. And the bank's holding of its own stock, which was concealed by the subterfuge of including the notes of the defendant as trustee in the amount of the stock so held among the loans and discounts and reporting the full amount of the capital stock as $200,000, necessarily tended to the harm of both creditors and stockholders. The effect of holding its own stock was detrimental to the interests of the creditors because it deprived them of the protec-

tion of the double liability of stockholders declared to them by the statute, and was detrimental to the stockholders of the bank by increasing their liability to subjection to the limit of their statutory obligation. Thus the natural if not the necessary tendency of the false publication as to the amount of the bank's outstanding stock and the amount of the stockholders' double liability was to deceive both stockholders and creditors. One is by the law held to have intended the natural and probable consequences of his acts. The defendant cannot effectively complain that the jury found that he intended by the false publication to deceive the stockholders and depositors of his bank, and the depositors were creditors.

(d) It is contended that the evidence does not establish that the defendant concurred in the publication of the false report complained of because it appears that he did not know of the publication until after it appeared in the newspaper. If the factual situation in this respect be as contended the conclusion does not follow. On January 8, 1931, and March 27, 1931, statements of the bank were published in the newspaper and handled as was the one of October 8th. In each of these prior published statements all bonds of the bank were scheduled as "unpledged." None were scheduled as pledged. The defendant's connection with these statements was the same as with that of October 8th. He insisted on the published statement being brought to him when he went over the detailed statement prepared for submission to the Commissioner of Banking. He must have read these prior statements. He made no correction in either of these statements and no suggestion that the bonds should be entered in the succeeding statement as pledged and unpledged according to the fact. The bonds were largely pledged at the dates of the previous statements. The statements had to be published in the newspaper at intervals as ordered by the Commissioner of Banking and the defendant knew that a state-

ment would have to be published on or about October 1st. In view of this we are of the opinion that the jury might properly find that the defendant "concurred in" the publishing of the October statement in form as it was published and in the inclusion of the false statement therein that the bonds held by the bank were unpledged. The same is true of the notes signed by the defendant as trustee above referred to and the false balance in the Marine National Bank.

We are of opinion that the jury might properly find the defendant guilty on count (II) of the information and that the judgment entered upon this finding must be upheld unless prejudicial error be found in some other respect claimed by the defendant. The other assignments of error will be taken up seriatim.

(3) The defendant interposed a plea in abatement on the ground that as the examining magistrate who conducted the preliminary examination bound the defendant over for trial on only sixteen of the thirty-five counts alleged in the complaint and "dismissed" nineteen of them, the circuit court had no jurisdiction to try the defendant on any of the "dismissed" counts, among which were included counts (I) and (II) upon which the defendant was convicted.

Respecting the so-called "dismissal" by the magistrate, it is to be noted that his original order committing the defendant for trial purports to hold "the defendant for trial in the circuit court." This order is prefaced by a recital that the magistrate deemed the evidence insufficient to support certain of the counts of the complaint specifically referred to by number and that those counts were dismissed. It further recites that as to the other counts specifically referred to by number the court found that an offense had been committed as alleged in those counts and that the defendant was probably guilty of each of said offenses. This order is of date September 11th.

The defendant after the record was in the circuit court procured an order from a court commissioner purporting to authorize the examining magistrate to amend his order holding the defendant for trial, and pursuant to this the magistrate made another "order" of date September 30th, reciting that among the counts sustained were 26, 27, 28, and 29, relating to publications of the financial condition of the bank on four separate dates; that some of the items in the counts purporting to have been dismissed by the magistrate were "apparently reflected" in the counts which were sustained by the magistrate and that the magistrate "intended" to find that the published statements so "reflected" were "false and were made with intent to deceive *only to the extent* that they reflected items in those counts which were sustained by the court, and were not false and made with intent to deceive as to those items which were the substance of the counts which were dismissed." Just what was meant by this we do not attempt to say, but it is contended by the defendant that as counts (I) and (II) on which the defendant was convicted were either covered by the counts dismissed by the magistrate or involved "the substance of the counts which were dismissed," whatever that means, the court had no jurisdiction to try the defendant on the counts upon which he was convicted.

Sec. 355.17, Stats., provides that the district attorney may file any information "setting forth the crime committed according to the facts ascertained on such (preliminary) examination and from the written testimony taken thereon, whether it be the offense charged in the complaint . . . or not."

Sec. 361.18, Stats., provides that the magistrate shall commit or bind the defendant for trial "if it shall appear that an offense has been committed and that there is probable cause to believe the prisoner guilty."

These statutes refute the contention of defendant upon this assignment of error. The district attorney in filing his information is not limited by the complaint. *Dahlgren v. State,* 163 Wis. 141, 157 N. W. 531; *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639; *O'Keefe v. State,* 177 Wis. 64, 187 N. W. 656; *Jones v. State,* 184 Wis. 50, 198 N.W. 598. Nor is he limited by the opinion of the magistrate as to the offense committed. Sec. 361.18, Stats., states the power of the magistrate and impliedly the limitation of his power. If it appears that *any* offense has been committed and that the defendant ʹis probably guilty of *any* offense, he must hold the defendant for trial. That is all he is authorized to do. He is not authorized to restrict the action of the district attorney in filing an information or to limit the power of the circuit court in determining for what offense or upon what specific charges the defendant shall be tried. Cases from other jurisdictions having no such statutes as above cited are entirely pointless. The plea in abatement was rightly overruled.

(4) The defendant moved to strike from the evidence the item under count (II) relating to the Continental Illinois Bank stock trustee note, and to instruct the jury to disregard it. The item was the subject of a false entry count in the information which the court dismissed at the close of the testimony. The ground of the motion seems to be that the matters covering the item were so set up on the books of the bank that they palpably would be discovered by the bank examiners, and therefore there could not have been any intent to deceive.

However, in count (II) while "intent to deceive" is involved, the intent is not limited as in count (I) to intent to deceive the Banking Commisioner and the bank examiners. Intent to deceive "any member, shareholder, or creditor" of the bank is involved in count (II); and there may have been an intent to deceive the depositors and other cred-

itors without intent to deceive the Banking Department officials. If the publication was such as actually to deceive depositors and other creditors, the intent to deceive them in publication of the item may be presumed. As above stated, one may always be presumed to have intended the natural and probable results of his own acts, in absence of evidence to the contrary.

The facts respecting the note under consideration are briefly as follows: The bank held forty-nine shares of stock of the Continental Illinois Bank & Trust Company. The Banking Commissioner informed the bank it could not hold this stock. The bank nevertheless continued to hold it through the same subterfuge that it held its own stock above related. The defendant took over the stock ostensibly as trustee, but as trustee for the bank, and gave his notes as trustee for the bank to the bank for the amount the stock cost the bank, and held the stock as trustee for the bank as collateral to the notes. The original amount of the notes was $10,138. Dividends on the stock were indorsed on the note. In December, 1929, these notes were replaced by a note of $20,138 signed by the defendant as trustee. The occasion was the declaration of a $10,000 dividend by the Capital City Bank. The writing up of the note by $10,000 offset on the bank's books the amount of the dividend and ostensibly justified a dividend of that amount. At this time the market value of the Continental Illinois Bank & Trust Company stock perhaps justified the marking up of the assets of the bank, considering the stock as such an asset, as it in fact was, although wrongfully held, and so perhaps would have justified the increase of the note at the immediate time had the giving of the note been justified. But the note was held at the increased amount until the bank closed. In the meantime the value of the Chicago bank stock had probably declined, but the note was carried as an asset of the bank and was so included in the published statement to make

up the amount of the notes and discounts. The defendant must have known all this. The item deceived the public into believing that the assets of the bank were at least $10,000 greater than they actually were, and probably more than $10,000 greater. For the stock was the asset, and the asset represented by it was no greater than the market value of the stock. The item therefore constituted a publication of the assets of the bank which presumably enhanced them falsely to the extent of $10,000. The transactions connected with this were evidence from which the jury might rightly infer that the statement published was false and that the defendant knew it was false as to the particular item. The evidence connected with the item tended to support the inference that the transactions connected with the item and the defendant's connection therewith were not harmless, as apparently the defendant's counsel were contending in respect to all matters involved under count (II). We are of opinion that the motion of the defendant to strike the evidence respecting this item was properly denied.

(5) Error is assigned because of denial of a motion made by defendant's counsel at the close of the testimony to strike the overdraft item from count (II).

The bank's books show overdrafts at the date given by the published report of $7,722.30. The report shows overdrafts of $3,209.84, a difference of $4,512.46. The publication was a false publication of the cash in bank to the extent of the difference of $4,512.46. It is contended by the defendant and correctly that the defendant cannot be charged with the mistake of employees of the bank in making out the report, except so far as he had knowledge of them. The state counters that the difference above noted is due to not including in the overdrafts an overdraft of the King Street Security & Realty Company, of which the defendant was president as well as president of the bank, and that he must have known of the omission of this item because the amount

of the overdraft of the company exceeded by over $1,000 the total amount of the overdrafts shown in the publication.

The statutes permit banks to invest thirty-five per cent. of their capital and surplus in the stock of a bank-building corporation. The Capital City Bank under this authorization held 857 shares of the King Street Security & Realty Company of $85,700 par value. The only asset of the company was a new building occupied by the bank at the time it closed. The total stock of this corporation was $86,000. Three shares were held, one each by the three directors of the King Street Security & Realty Company, all whom were directors of the bank, and one of whom was the defendant. The only transactions of the King Street Security & Realty Company were those connected with the renting and operating expenses of its building occupied in most part by the bank.

The same consideration upon which we hold that the evidence was sufficient to warrant the jury in finding that the defendant had knowledge of the falsity of the published statement as to the amount of the unpledged bonds applies here, but perhaps with somewhat less force. The defendant was the president and managing officer of both corporations. The transactions of the building company were few. The jury were warranted in finding that he should have known, and that as he should have known he did know, of the fact of the large overdraft of the building company. There is no evidence tending to show that he did not know of it. While it is true as recently held in *State ex rel. Kropf v. Gilbert,* 213 Wis. 196, 251 N. W. 478, 486, that a bank officer is not chargeable with knowledge of the entries on the corporate books of the bank solely by reason of his supervisory powers, it does not follow, in case of a corporation whose transactions were so limited as were those of the building company, that knowledge of the condition of its bank account as to overdrafts, especially when that account is with a bank of

which he is himself the president, may not be inferred, in absence of evidence tending to show his ignorance of it. It is stated in the opinion in *Schroeder v. State,* 210 Wis. 366, 375, 244 N. W. 599, 250 N. W. 185:

"As is conceded in defendant's brief, the president of a bank, who is active in the conduct of its business, is chargeable with knowledge of its financial condition."

Counsel herein say in their brief that they do not quarrel with that statement as applied to that case. An overdraft to the extent of over $4,000 of a corporation like the King Street Company is such an element of its "financial condition" that its managing officer may properly be held chargeable with knowledge of it, in absence of evidence to the contrary.

In connection with this assignment of error it is contended in the briefs of counsel for the defendant that where an information contains several counts, one or more of which are sustained by the evidence and others not, a general verdict of guilty is insufficient to support a judgment thereon because it cannot be told whether the jury agreed upon the counts insufficiently supported or those sufficiently supported. They contend further that the rule as contended for by them should be applied where several matters are covered by a single count; that is, they contend that if the evidence is insufficient to support a finding of guilt as to any one or more of the matters covered by count (II) although sufficient as to others, the verdict of guilty does not support the judgment because it does not affirmatively appear that the jury did not find the defendant guilty as to those matters wherein the evidence was insufficient. In support of the proposition first stated they cite 3 Wharton, Criminal Procedure (10th ed.), sec. 1671, and 2 Bishop, New Criminal Procedure (2d ed.), sec. 1015. Examination of the sections referred to will show that the rule contended for is not general. In Bishop, sec. 1015 (4), it is stated that a general sentence on good

and bad counts is not reversible if sustained by the good ones, and a multitude of cases is cited in support. In Wharton, sec. 1671, it is stated that "When there is a good and a bad count and a general verdict of guilty, it has been held that a valid judgment can be entered on the verdict, which will be presumed on error to have been entered on the good count." Two Wisconsin cases are cited in support of this statement. Both support it, and neither has been overruled. *State v. Kube,* 20 Wis. *217; *Chase v. State,* 50 Wis. 510, 7 N. W. 376. We see no reason to overrule them now. The situation is the same as under a general verdict in a civil case where several grounds of recovery are laid, as in a tort case grounded on several distinct charges of negligence for example, if one or more of the grounds laid is supported by the evidence and others not, the jury having been properly instructed that agreement on one of the grounds is necessary to sustain a verdict for the plaintiff, judgment on a general verdict for the plaintiff will be upheld. *Bushee v. Wright,* 1 Pin. 104; *Fehlhaber v. McFadden,* 156 Wis. 462, 465, 146 N. W. 484. Under this rule, the finding of guilt being sustained in the particulars above mentioned under (2), it is immaterial whether it is sustained in other particulars. In such situation the court will assume that the jury's verdict is based upon the matters sufficiently proven, rather than upon those insufficiently proven. It does not affirmatively appear that the verdict is based upon the matters insufficiently proven and prejudice will not be presumed unless it does so appear. Sec. 274.37, Stats. The case of *Koscak v. State,* 160 Wis. 255, 152 N. W. 181, is cited as supporting the contention of the defendant, but we do not so regard it. The statute there involved covered two states of fact, one of which did and the other did not include the element of knowledge of intent of other persons to use designated explosives for a designated unlawful purpose. There was no evidence of "knowledge" of such intent of other

persons. The instructions were so framed that knowledge of such intent of others was made an element of the offense not including such intent by others. Thus the offense of intending to use for the designated purpose was not established within the instructions upon the subject given by the court. It is to be noted that there was a vigorous dissenting opinion in the *Koscak Case*. But passing that, we have no such situation here. The jury were here specifically correctly instructed that if they found beyond reasonable doubt that the statement involved in count (II) was false "in any respect" and that all the other elements essential to the offense which were specifically enumerated existed, then the commission of the offenses was established.

(6) It is claimed that error was committed in instructing the jury that "Mr. Hobbins, as president of the bank, actively engaged in managing and dominating all the affairs and active in the conduct of the bank's business, is chargeable with knowledge of its business transactions and the record of it." This instruction was obviously based upon the statement in the opinion of this court in the *Schroeder Case, supra,* which is to the effect that the president of a bank, active in the conduct of its business, is chargeable with knowledge of its financial condition.

The defendant claims the given instruction is contrary to the statement in the opinion in *State ex rel. Kropf v. Gilbert, supra,* that "a corporate officer is not chargeable solely by reason of his official supervisory powers with knowledge of the entries on the corporate books of account," which is followed by the statement that he is chargeable with knowledge of entries made "at his direction." The statement of the instruction complained of is perhaps too broad. The instruction was given in direct connection with count (I), which involved the $13,437.60 item respecting the account with the Marine National Bank. It is without dispute that the defendant *directed* the entries respecting this account and knew how the account was kept. The court later in the

charge to the jury stated in connection with this count that "a false entry may be proven if made by another at another's direction or procurement or because the officer set the machinery in motion which requires the entries to be made."

However, the charge later definitely stated as to knowledge in connection with count (II) that "constructive knowledge or imputed or that which might be obtained by the exercise of due care is not sufficient to come within the meaning of the term 'knowingly,' and that if you find only such kind of knowledge you must find the defendant not guilty."

Whether the instruction complained of was erroneous as applied to count (I) is immaterial as we hold that conviction on that count was improper under the evidence. We are of opinion that the instruction given in connection with count (I) was not prejudicial in view of the fact that a correct definite instruction upon the point of imputed knowledge was given in direct connection with count (II).

(7) It is claimed that a new trial should have been ordered in the interests of justice. In support of this contention it is urged that the state proved that the defendant's salary as president of the bank was $10,000 per year. This was not improper. It had to do in some measure with the degree of attention the defendant should have given, and therefore presumably did give, to the affairs of the bank, and therefore upon the inference properly to be drawn as to his knowledge of matters covered by the information.

Objection is made that in answer to inquiry by defendant's counsel whether the state would concede that the defendant did not profit personally from the transaction involved, counsel for the state said: "We will make no proof that Mr. Hobbins profited personally in what we claim were false entries upon the books of the bank except so far as he got $10,000 salary and except that we shall show by argument to the jury from the testimony in the case that through false entries made the depositors suffered immensely." Relating to the same point, a question was put by defendant's

counsel to a state's witness whether he found that any interest, income, rent, or dividends on stocks of the bank held by the defendant as trustee for the bank passed personally to the defendant. Counsel for the state then stated if there was going into the record any testimony at all that the defendant "did not profit personally by misdeeds in that bank" he would offer evidence to the contrary.

To us it seems that the remarks of the state's counsel were no more out of place than the inquiry whether the defendant profited personally. It was immaterial whether he profited personally. But if it was urged that he did not so profit, it was proper to reply that had he seen that the affairs of the bank were conducted properly and statements of its true condition were published properly the bank would have been closed and his $10,000 salary cut off sooner than it was, and that he therefore did so profit. It might also properly be argued in reply that dividends were declared after the bank should have been closed and that he profited personally from these.

It is also urged that owing to the public attitude towards bankers it was impossible to get a fair trial; and that counsel for the state in his argument to the jury aggravated this situation by saying in connection with the notes signed by the defendant as trustee for the bank: "When you happen to have any money and put it in the bank, you are a creditor of the bank, you are a part of the bank; and they put in this sort of stuff (notes of the defendant as trustee for the bank) as assets of the bank and publish it to the world. There they are—look at them when you go to your jury room. They were in the bank when the bank closed, and they are here now. What are they going to do about it? Will you, when you go to the jury room, say on your oaths that you believe that anybody will ever collect a cent from these notes?" This like the other matters above mentioned was only tit for tat. The defendant was insinuating if not contending that the defendant should not be punished because he did not

profit by the misconduct involved in the charges, and the state was suggesting that others suffered from them if he did not profit. The latter was no more improper than the former. Attempt to excite sympathy was no less objectionable than the attempt to excite prejudice, if there were such attempts.

*By the Court.*—The judgment entered by the circuit court upon the count of the information herein designated as count (I) is reversed with direction to dismiss as to that count; the judgment entered upon the count herein designated as count (II) is affirmed.