State, Plaintiff, vs. Rogers, Defendant.

*September 17—November 9, 1937.*

40

44

*Spencer Haven* of Hudson, attorney for the plaintiff and counsel for the Board of State Bar Commissioners.

For the defendant there was a brief by *Leon E. Isaacson, San W. Orr,* and *H. H. Thomas,* all of Madison, and oral argument by *Mr. Thomas* and *Mr. Isaacson.*

A brief was also filed by *W. Wade Boardman* of Madison, as *amicus curiæ.*

PER CURIAM. Sec. 189.23 (2) (b), (f), and (g), Stats. 1929, are a part of what is commonly referred to as the Blue Sky Law of this state. The whole purpose and object of the enactment of this law was to prevent the public from being imposed upon by the sale or offer for sale of any worthless or fraudulent securities or other securities not issued in accordance with the provisions of the act and the orders of the railroad commission (public service commission). A violation of the act in any of the particulars specified was made a felony, although the defendant was upon his conviction punished only by the imposition of a fine. By the verdict of the jury as well as by the findings of the referee in this proceeding the defendant was found to have violated the provisions of this section by consenting to the issue and sale of securities in violation of the act, by assisting and causing the proceeds of the sale thus made to be devoted to a purpose other than that specified in the permit issued by the public authorities, and by consenting to the issuance and circulation of advertising matter which contained false and misleading statements. It appears from the evidence that the defendant as an attorney at law procured the issuance of the permit in question for the sale of these securities upon certain specified conditions. He had had more experience than the ordinary practitioner in the procuring of such permits, and must have been thoroughly familiar with all of the provisions of the statutes. While he was not, as found by the jury, an actor in the sale and unlawful conversion of

the securities, he was apprised of the fact that the securities were being sold in violation of the permit, and must have known of the misconduct of the other officers of the corporation in converting the proceeds to the use of the corporation of which he was vice-president, director, and counsel. It is immaterial so far as consideration of this case is concerned whether defendant's misconduct in this regard was connected with his conduct as an attorney or as an officer of the corporation if the acts complained of evidence moral turpitude. *Wolfe's Disbarment* (1927), 288 Pa. 331, 135 Atl. 732, 50 A. L. R. 380; 5 Am. Jur. p. 432, § 284.

When it came to the knowledge of the defendant that the funds derived from the sale of the restricted bonds had been misapplied by the corporation to the extent of $20,000 or more, he, as a lawyer, was confronted with a very serious situation. He was well aware of the fact that the conditions contained in the permit issued by the railroad commission had not been complied with; that the bonds were being sold illegally and in violation of the terms of the permit, and the funds derived from the sale converted to the use of the corporation. When that knowledge came to him, he was confronted with one of two choices: (1) To denounce the transaction, sever his connection with it so as to no longer be responsible for it and to advise his client, the Beecroft Building Company, that its funds were being improperly applied and advise his fellow officers in the Boyd Company that they were committing serious offenses under the laws of the state of Wisconsin; or (2) to protest ineffectively and go along with the other officers of the company in the conduct of the illegal transaction in the hope that in some way or other the legal consequences of the unlawful conduct of the officers might be avoided either by restoration of the misapplied funds or in some other possible way. If under the circumstances he permitted Mr. Boyd to dominate the situation, that fact can scarcely be held to be a justification of his failure to determine the moral qualities of his own

acts. Defendant was in such a position that he could not remain neutral and do nothing. If he failed to protest effectively, he gave consent by acquiescence. He was obliged either to acquiesce or sever his connection with the transaction. It is undisputed in the record that although thereafter he protested, from time to time, he did nothing further although he knew or should have known that the illegal sales, advertisements, and misapplication of funds were continuing.

The defendant is well known to every member of this court, who have entertained for him a high regard. It is with personal regret therefore that we are obliged to reach the conclusion that upon the facts of this case the referee must be sustained. The referee in view of the circumstances used rather mild language when he said that defendant's delict was due to a lack of courage to oppose Mr. Boyd, the dominant factor in the company. The record impresses us that it was not so much a lack of courage as it was that he let the matter slide along in the hope that in some way the company and its officers would escape the consequences of their wrongful and illegal acts. This is the way most persons feel who wrongfully appropriate the funds of another. They expect to restore the fund and escape the consequences. The hope of restoration does not affect the degree of the offender's guilt. *Glasheen v. State* (1925), 188 Wis. 268, 205 N. W. 820. As a matter of fact, the evidence shows that the officers, including the defendant, made an effort to sell additional stock in the company and to realize on some of its assets in order to make restoration, but this hardly justifies or excuses the continued misapplication of funds. It does show, too, that the defendant and his fellow officers were apprehensive of the consequences of their acts.

We come now to a consideration of a matter which relates wholly to the duty of the defendant as attorney for the Beecroft Building Company. In the first place it should be said that the defendant with the full knowledge and consent of both companies was to act as the legal adviser of the

Joseph M. Boyd Company and the Beecroft Building Company in the matter of the qualification and sale of the so-called Beecroft bonds. At the time when the defendant entered into this relationship the Beecroft Building Company knew that the defendant was an officer of the corporation and its attorney. While an attorney may under certain circumstances act as attorney for both parties to a transaction, when he does so he places himself in a very equivocal and precarious position, one which attorneys under most circumstances scrupulously avoid. Under such circumstances an attorney is under a duty of loyalty and faithfulness to both clients, and when, as in this case and as a matter of fact in most cases, there arises a conflict of interest as between the two clients, there arises with it a conflict of duty on the part of the attorney. It was very difficult, if not impossible, for the defendant to remain loyal and faithful to both his clients under the circumstances of this case. While an attorney may properly act as attorney for both parties with the knowledge and consent of both, when a conflict of interest does arise, it becomes his duty as an attorney to make full disclosures to both or to terminate the relation of attorney and client as to both. Whether this would terminate his duty to disclose facts already discovered, would depend upon the circumstances of each case. In civil cases a contract made by one acting as agent for both parties who has failed to make proper disclosures is ordinarily held to be invalid and unenforceable. Here, however, we have a different situation. The defendant was attorney for the Beecroft Building Company with the consent of the Joseph M. Boyd Company. It must be presumed that each knew that he was under a duty to both. He was under a duty of loyalty to the Boyd Company to respect its confidences. He was under a duty to the Beecroft Building Company to convey to it any information received by him in the course of his employment which affected its interest in the transaction.

The defendant chose to disregard his duty to the Beecroft Building Company and, as found by the jury and referee, was a party to the continued oversale of the bonds, the misapplication of the funds derived therefrom, and the fraudulent advertisement of securities to the public. We find it impossible to reconcile this conduct of the defendant with the standards of conduct which should obtain in the relationship of attorney to his client. The whole matter was laid bare to him, he knew that the money of the Beecroft Building Company was being wrongfully used by the Boyd Company in which he had the interest of a stockholder, attorney, and officer. His protests do him credit but they do not absolve him from his duty of loyalty and faithfulness to his client, the Beecroft Building Company. This failure to perform his duty resulted in a huge loss to his client and to the investing public, the very type of loss the act violated was enacted to prevent.

We are urged by counsel for the defendant and *amicus curiæ* to hold that defendant's conduct involves no moral turpitude on the ground that it was the result of an error of judgment; that he was under a duty both to the Boyd Company and the Beecroft Building Company; and that any want of loyalty to the Beecroft Building Company was due to a conflict of loyalties. Under the facts of the case, any conduct of the defendant which would have involved mere want of care on his part up to the time that it was reported to him at a meeting of the board of directors that the Beecroft bonds had been oversold by an amount exceeding $20,000, might possibly be excused. Counsel for the defendant argue the matter as if the question was whether or not the defendant was under a duty to withdraw from his employment. That was not his whole duty. He was in a situation where his failure to take positive and decisive action amounted to acquiescence in a continuation of the violation of the Blue Sky Law in three particulars, each of

which constituted a felony, and of a failure to discharge the positive duty he owed his client, the Beecroft Building Company. As to the moral quality of this act, it is considered there can be no question. The defendant testified:.

"I felt there was an obligation on me to fix this up. I was talking to all of these directors too, and influencing them the best I knew how to fix this up. . . . It occurred to me that this practice should stop. . . . I talked with Mr. Boyd and Mr. Kropf and Miss Quam and I influenced them as best I could."

It appears that the defendant was well aware of the situation and its necessary implications, yet he continued to acquiesce and participate in the conduct of the affairs of the corporation which was selling unqualified securities to the public, fraudulently advertising them, and wrongfully converting the proceeds of the sale to its own use, and he failed to advise the Beecroft Building Company of the facts. This is not a case where an attorney and officer of a company was unwittingly led into a situation involving moral and legal consequences. After the first disclosure his own testimony shows that he was aware of the legal and moral implications involved. He realized that the matter should be "fixed up," and yet he allowed the conversion and the violation of the orders of the railroad commission to continue.

We can come to no other conclusion than that this was in law an intentional wrong committed in violation of the highly remedial statute designed to protect investors against misconduct of the kind specified, and that it does involve moral turpitude. The acts of the defendant were not designed and premeditated, but they were wrongful nevertheless. It is no excuse to say that it was not an offense at common law because in the days of the common law the situation which the legislature sought to deal with by the Blue Sky Law did not exist. The legislature by the severity

of the sanctions contained in the law sought to deal with the evil at its source.

It is further considered that the defendant was derelict in his duty to his client, the Beecroft Building Company. It is true, as said in the briefs, that an attorney is under duty of loyalty to his client and is forbidden to disclose confidential statements made to him in that capacity. However, when the Boyd Company consented and requested that their attorney act as attorney for Dr. Beecroft in respect to qualification and sale of these securities, their privilege in that respect was waived. The Boyd Company knew that thereafter the defendant was under a duty of loyalty to both parties to the transaction, and that it was his duty to disclose to each whatever he discovered in relation thereto which affected the interest of each of his clients. If an attorney acting as such for two parties with the consent of both discovers that there is a conflict of interest, he is, as has been said before, under duty to withdraw from both employments or to make full and complete disclosure to both. If, as the defendant testified, he believed that Dr. Beecroft knew of the oversale, and he says he was told that was the fact by Mr. Kropf and Mr. Boyd, then there was no excuse whatever for him not making a complete disclosure to Dr. Beecroft. As mortgagor and maker of the bonds in question, Dr. Beecroft, as managing officer of the Beecroft Building Company, was entitled to a full report at any time. Such a report would have disclosed the fact that the moneys received from the sale of bonds were being wrongfully converted by the officers of the Boyd Company. If Dr. Beecroft had consented to the oversale, his consent would have been no defense to the charges relating to violation of the Blue Sky Law. He could not by his consent give the defendant and other officers of the Boyd Company a license to violate the statute and so commit a crime. A consent to the

sale would not have been a consent to the conversion of the funds derived therefrom. It is not claimed that the Beecroft Building Company had knowledge of the conversion until a short time before the Boyd Company closed its doors.

The defendant testifies that he did not at any time have any intention of violating the provisions of the Blue Sky Law as set out in the first three counts of the information, nor did he ever at any time have any intention of converting or embezzling or assisting in converting and embezzling any moneys derived from the Beecroft Building Company, yet under the facts as found by the jury and by the referee he did in fact do the very things the law forbade him to do with respect to the advertisement and sale of the bonds and conversion of the proceeds. If the failure of the defendant to make disclosures to Dr. Beecroft stood alone, in view of the conflicting duties under which the defendant labored at the time, it might perhaps be excused although it could not be justified, but when the consequence of the failure to disclose was to protect the Boyd Company from its past wrongs and permit it to continue in the wrong, the whole matter wears a different aspect. It is considered therefore that the recommendation of the referee should be sustained.

*It Is Ordered,* that the defendant's license to practice as a member of the bar of this court be revoked and suspended for a period of two years from the date of the entry of judgment herein and thereafter until the same be restored and he be reinstated upon presentation of evidence of the payment by the defendant of the costs of these proceedings, including the fees of the reporter and referee to be taxed by the clerk of this court, and that it further be made to appear that he has in the meantime refrained from the practice of law.