31 Wis.2d 151 (1966)
STATE, Respondent,
v.
WOODINGTON, Appellant.[*]
Supreme Court of Wisconsin.
April 18, 1966.
June 7, 1966.
*161 For the appellant there were briefs by Immell, Herro, Buehner, DeWitt & Sundby, attorneys, and Lawton & Cates of counsel, and David Loeffler of counsel, all of Madison, and oral argument by Richard L. Cates and Jack R. DeWitt.
For the respondent there was a brief by Bronson C. La Follette, attorney general, and William A. Platz, assistant attorney general, attorneys, and Earl H. Munson, Jr., of Madison of counsel, and oral argument by Mr. Munson.
BEILFUSS, J.
Although the appellant has enumerated 16 assignments of error, they will be categorized into four issues:
1. Were the activities of the state's agents prior to trial such that there was a deprivation of due process requiring dismissal of the charges?
2. Was the evidence sufficient to convict appellant beyond a reasonable doubt?
3. Were the instructions prejudicially erroneous?
4. Is sec. 189.19 (2) (d), Stats., void for vagueness?
*162 The appellant contends that the conduct of the state's officers, particularly the attorney general, during their investigation of MAGIC, and eventually Allied, deprived appellant of due process of law, for which dismissal is the appropriate remedy.
An investigation into MAGIC began about August 6, 1964, and ended about November 1, 1964. During this period, just prior to the 1964 general election, several state officials exchanged letters and issued press releases.
The import of the attorney general's statements was to the effect that he had received complaints about the operation of MAGIC and that the insurance commissioner had refused or had neglected to cooperate in an investigation of the complaints and had withheld materials and information necessary for the investigation by the attorney general. He also claimed the governor refused to cooperate and condoned the actions of the insurance commissioner. Further claim was made that the district attorney of Dane county was reluctant to cooperate. Although reference was made by the attorney general to the fact that Woodington and Kelly were members and substantial contributors to the political party of the governor and district attorney, he did not specifically accuse or state that Woodington or Kelly was guilty of any crime. His statement was to the effect that the investigation should proceed forthwith so that their guilt or innocence could be established.
Woodington and Kelly also participated in the publicity by issuing news releases and by purchasing full-page newspaper space for their statements.
The charges, countercharges and explanations did receive publicity and comment in the press, radio and television.
The appellant does not rely upon the content of the publicity to support his argument for dismissal. He states in his brief, "Our focus is solely upon the source, *163 i.e., agents of the state, and particularly the Attorney General."
Further, the appellant does not categorically claim he did not receive a fair trial but rather the pretrial publicity was such that it is not certain he did receive a fair trial or that he could have received a fair trial in any area in the state and was thus denied due process under the Fourteenth amendment of the United States constitution.
Appellant moved for dismissal before trial. The motion was denied. No motion for change of venue or continuance was made, even though the trial court virtually invited such motions. Appellant did not move for a new trial on this ground and does not now ask for a new trial based upon prejudicial pretrial publicity. He asserts the only adequate remedy is a dismissal of the charges.
It is significant that appellant did not make a record of the voir dire examination, apparently had no trouble in drawing a jury, and has nowhere alleged that the particular jury selected was in any way prejudiced or unfair. It is fundamental that appellant must show that he did not receive a fair trial before he can get to the question of whether or not a fair trial could ever be obtained.
Sec. 14.526 (1), Stats., provides:
"There is created within the office of the attorney general the division of criminal investigation for the purpose of investigating crime which is statewide in nature, importance or influence."
It is thus apparent that the attorney general has a legitimate interest in investigating complaints of criminal conduct if, in his opinion, the investigation is warranted.
A perusal of the various due-process cases indicates that the law is concerned with the actual effect ill-advised pretrial publicity produces at the trial.
In Delaney v. United States (1st Cir. 1952), 199 Fed. (2d) 107, the defendant, who was collector of internal *164 revenue for the district of Massachusetts, was charged with violations consisting of taking money to influence decisions before him. He was suspended, removed, indicted, and arraigned with the expected publicity in the Boston newspapers. At the time of these occurrences there was a congressional committee on administration of internal revenue laws conducting investigations. This committee sent word that it intended to proceed promptly with its public hearings. Delaney protested because his trial had not occurred, and the only possible result of public hearings would be to adversely prejudice the community against him. A member of the justice department appeared before the committee to urge that matters before it not be publicly disclosed, but the committee proceeded with its public hearings over additional justice department entreaties.
The committee conducted public hearings in Boston which were extensively reported in the newspapers. The hearings resumed in Washington where they focused on Delaney. Boston papers sent feature writers to cover the events. Many witnesses before the committee had testified before the federal grand jury in the Delaney Case. Delaney was not subpoenaed or invited to the hearings. No cross-examination was allowed. The evidence went far beyond that relevant to the charges against Delaney and concerned his private, personal affairs, and other possibly criminal conduct. At the close of the hearings the committee chairman commented publicly on the hearings.
The court stated:
"Since the committee evidently felt that there were overriding considerations of public interest which demanded that its open hearings proceed, it must be inferred that the committee intended, as indeed it must have foreseen, that its proceedings would receive the most widespread publicity. The record sets forth this resulting publicity in overwhelming detail." Id. page 111.
*165 Delaney filed a motion to dismiss and a motion for continuance. Both motions were denied. The court of appeals stated:
"As to the motion to dismiss the indictments . . . we see no reversible error in the denial of this motion. The damaging publicity resulting from the King Committee hearings took place after the indictments had been handed down, and cannot be supposed to have infected the deliberations of the grand jury. Nor could it be said, in this case, if indeed it could be said in any case, as a matter of law, that the prejudicial effect of this publicity was so permanent, and ineradicable by mere lapse of time, that the court should have recognized the impossibility of a fair trial ever being held at any time within the foreseeable future." Id. pages 111, 112.
The court went on to recognize that this was a unique case in the sense that the publicity was not initiated by newspapers or private persons, but by the United States itself. The court determined that:
"If all this material had been fed to the press by the prosecuting officials of the Department of Justice, we think that an appellate court would have had to say that the denial of a longer continuance was an abuse of discretion." Id. page 113.
"We think that the United States is put to a choice in this matter: If the United States, through its legislative department, acting conscientiously pursuant to its conception of the public interest, chooses to hold a public hearing inevitably resulting in such damaging publicity prejudicial to a person awaiting trial on a pending indictment, then the United States must accept the consequence that the judicial department, charged with the duty of assuring the defendant a fair trial before an impartial jury, may find it necessary to postpone the trial until by lapse of time the danger of the prejudice may reasonably be thought to have been substantially removed." Id. page 114.
Nowhere in this case, although the issue was directly before it, did the court suggest the possibility that dismissal *166 would be appropriate. The court did, however, reverse as to the denial of the continuance.
Commonwealth v. Geagan (1959), 339 Mass. 487, 159 N. E. (2d) 870, certiorari denied 1959, 361 U. S. 895, 80 Sup. Ct. 200, 4 L. Ed. (2d) 152, was the case concerning the great Brinks robbery in Boston in 1950. Defendants there moved to quash the indictments because they could never receive a fair and speedy trial. The motion was based on press releases and statements of state and federal law-enforcement authorities which received emphasis in the newspapers.
The court labeled any publicity created by public officials as indefensible, but it did not dismiss.
"If there was publicity created by enforcement officials, this was indefensible. It does not follow, however, that the inevitable result is that the defendants must be released, because they can never constitutionally be tried . . ., or that these particular indictments should be quashed." Id. page 501. See also United States v. Medlin (6th Cir. 1965), 353 Fed. (2d) 789.
The remedies in publicity cases are change of venue, continuance, and careful selection of a jury.
The several cases considering state or federal initiated publicity, as the case may be, do not support appellant's contentions, nor has he cited any which do. He suggests that a fair trial could never have been had under the circumstances. The cases dispute such a contention.
Alternatively, he urges that public policy requires dismissal as the only adequate remedy to curb the undesirable conduct of prosecutors and state officials.
For the courts to interfere with the attorney general's duty to investigate and prosecute crime and make public material he deems in the public interest could be an unwarranted interference with the balance of power. This is pointed out in Delaney as to the legislative branch, and is said to apply to the executive branch as well.
*167 The attorney general is a high constitutional executive officer. He is an important law-enforcement officer of the state. In a broad sense he is the attorney for our body politic. He should be allowed sufficient latitude to inform the public as to his activities in matters of great public concern. This right, however, should be exercised with circumspection so as not to prejudice or impair the rights of a defendant in either prospective or pending litigation.
The attorney general is not on trial in this matter. If his conduct overstepped the bounds of his legal ethical obligations (we do not characterize his actions as such), proper inquiry could be made by the integrated bar disciplinary procedures under Canon 20 of the "Canons of Professional Ethics."[1]
More significant in this case is that appellant did not move for a change of venue although the trial court virtually invited such a motion. He did not move for a continuance. He has not made a record of the voir dire *168 examination.[2] He has not moved for a new trial because of adverse publicity. He has not in any way alleged or shown that the trial he received was unfair. He only asserts that the events prior to trial have created an uncertainty concerning the fairness of the trial. Such an assertion may not be sufficient to justify either a continuance or change of venue, much less dismissal.[3]
Frank v. Mangum (1915), 237 U. S. 309, 35 Sup. Ct. 582, 59 L. Ed. 969, was a case involving an alleged denial of due process because of public sentiment against defendant. On habeas corpus defendant asked for dismissal because the trial was dominated by mob rule. The supreme court stated:
"We are very far from intimating that manifestations of public sentiment, or any other form of disorder, calculated to influence court or jury, are matters to be lightly treated. The decisions of the Georgia courts in this and other cases show that such disorder is repressed, where practicable, by the direct intervention of the trial court and the officers under its command; and that other means familiar to the common-law practice, such as postponing the trial, changing the venue, and granting a new trial, are liberally resorted to in order to protect persons accused of crime in the right to a fair trial by an impartial jury. The argument for appellant amounts to saying that this is not enough; that by force of the `due process of law' provision of the Fourteenth Amendment, when the first attempt at a fair trial is rendered abortive through outside interference, the State, instead of allowing a new trial under better auspices, must abandon jurisdiction over the accused and refrain from further inquiry into the question of his guilt.
"To establish this doctrine would, in a very practical sense, impair the power of the States to repress and *169 punish crime; for it would render their courts powerless to act in opposition to lawless public sentiment. The argument is not only unsound in principle but is in conflict with the practice that prevails in all of the States, so far as we are aware." Id. pages 336, 337.
The above is not a state-initiated publicity case, but it does reflect the public policy factors equally at play in such cases.
Upon the record before us we must reject the contention that the action against the appellant should be dismissed because of the alleged prejudicial pretrial public statements of the attorney general.
Appellant has argued that there was no evidence (1) that he filed the statement "knowing" it would deceive the protected class of persons; and that the evidence was insufficient to show (2) that he should have known the statement to be false or misleading, (3) that he "knew" cash to be false or misleading, (4) that cash was false, and (5) that cash was misleading.
What had been occurring for some time was a check exchange procedure in which Hoard's would write a check to Allied and Allied would write one back to Hoard's on the same day or a day later. Such a transaction would not affect Allied's or Hoard's books except to the extent that the amounts varied or the checks were written or received on different days. However, so far as the banks were concerned, the effect was to inflate Allied's cash in its bank account. This resulted because Hoard's checks which were written on the First National Bank of Fort Atkinson were treated as collected funds by Allied's bank, American Exchange Bank in Madison. Collected funds are funds which have been paid by the payor bank as a result of the clearing process. This takes two or three days between Fort Atkinson and Madison. On occasion Hoard's would hold the Allied check for several days before depositing it in the First National Bank. The effect was to give Allied a bank loan for several days. Its bank balance would be positive, but it would have *170 checks outstanding which would substantially reduce or negate the cash balance shown on the bank's books. The amount needed to cover the checks outstanding would come from subsequent check exchanges. However, there was never enough money available in the several accounts to pay all outstanding checks if one could stop the clock, so to speak, and add up the bank balances and outstanding checks. This is, in effect, an overdraft.
To further complicate this situation, B & W had an account at the American Exchange Bank which occasionally became involved. Since this account was in the same bank as Allied's general account, there would be no advantage as a result of the clearing process. However, Woodington maintained a personal account in the Commercial State Bank in Madison which was used by appellant, B & W, and Allied as needed. It was always kept in a collected condition so that certified and cashier's checks necessary for real-estate closings could be drawn. This account (hereinafter NAW) was used to make a triangular check exchange on occasion. The exhibits (57-60) graphically illustrate the procedure used, which is a form of check kiting.
There are innumerable definitions of check kiting but the accountants who testified all agreed that it involves a transfer of funds between two or more banks to obtain unauthorized credit from the bank during the time it takes the checks to clear.
There is some question concerning whether a kiting operation actually occurred because there was testimony that the banks knew what was occurring and agreed to it. In any event, that is not the issue. Kiting is not per se illegal. It may be poor banking practice and a concern for the commissioner of banking, but it is not a crime and is not the substance of the crime charged. The information alleges the appellant filed a false or misleading report with the department of securities.
On March 31, 1964, Allied showed in its balance sheet cash at $224,356. This figure was arrived at by adding *171 deposits in transit to the bank balance and subtracting checks outstanding. Deposits in transit totaled $276,221.
An examination of the deposits in transit reveals two checks on NAW to Allied totaling $25,000 dated April 1, 1964, and one check on B & W dated April 1, 1964, for $19,500. The accountants all testified that these cannot be included as cash on March 31st because dated April 1st, and because the NAW and B & W accounts were overdrawn a minimum of $47,552 and $353,592 respectively. One must look behind checks from subsidiary or related companies to see that there are funds available to pay them before including them as cash. Deposits in transit also included a check for $25,000 drawn on NAW and a check for $98,500 drawn on B & W, both accounts being closely related to Allied and in a substantial overdraft position. The exhibits illustrate that even if the checks dated April 1st had been dated March 31st both accounts would still have been in an overdraft status.
There was also a factor's lien transaction on March 31st with Industrial Credit whereby Allied received $100,000. The check was dated April 1, 1964, but it was included as cash on March 31st. Exhibit 61 shows the actual cash figure for Allied on March 31st. After subtracting the six checks included above, the balance is an overdraft of $43,643. However, the accountants deemed it proper to deduct an additional $100,000 which was the portion of the cash balance created by the exchange of checks with Hoard's.
Whether there was check kiting, whether the outstanding checks were paid, whether investors were damaged, and similar questions are all irrelevant. The only issue is violation of the statute, sec. 189.19 (2) (d), which follows:
"(2) Every director, officer, agent or employe of any issuer and every dealer, agent, investment advisor or other person shall be imprisoned in the state prison not exceeding 5 years, or in a county jail not exceeding one year, or fined not exceeding $5,000, or both, who shall directly or indirectly:
*172 ". . .
"(d) File or cause to be filed with the department any statement or representation of a material fact, which statement or representation he knows or in the exercise of reasonable care should know to be false or misleading."
Appellant contends that a double meaning must be given to the word "know" in the statute. He argues that the state must prove that he believed the statement false or misleading and that he filed it for the purpose of deceiving investors. The language of the statute clearly negates this argument. Not only does it specifically condemn the filing of a false statement, but it also encompasses filing a statement which the filer should know to be false or misleading. Intent to deceive is not an element of a negligent filing of a false report. Neither does the statute require intent to deceive in the intentional filling of a false report.
The test on appeal of sufficiency of the evidence is whether the "`evidence adduced, believed, and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt.'" State v. Waters (1965), 28 Wis. (2d) 148, 153, 135 N. W. (2d) 768, quoting from State v. Stevens (1965), 26 Wis. (2d) 451, 463, 132 N. W. (2d) 502; Lock v. State, ante, p. 110, 142 N. W. (2d) 183.
Appellant's argument here is that the size and complexity of Allied's operations made it necessary to delegate duties and to rely on statements of others.
When dealing with a duty of reasonable care, we are dealing with the exercise of reasonable care under the circumstances. This is what the trial court instructed. Thus, the actual duty imposed will vary depending upon the size and formal structure of the businesswhether a small sole proprietorship or a large corporationand upon other factors. It was for the jury to determine whether under the circumstances of this case appellant should have known the statement was false or misleading.
*173 There is no question that appellant initiated the check exchange scheme. There was no question but that he knew that such a scheme would create an artificial bank balance. He is an attorney-at-law. He was a very distinguished student. He helped organize and was dominant in several corporations related to Allied from 1953 to 1964. Significantly, he had done the same thing in 1961 until advised to stop the practice by the commissioner of banking. He engaged in check kiting when Allied needed working capital and intended it to continue only until funds were raised by stock sales. He knew the financial condition of Allied better than anyone but the internal accountant. Most important is the fact that appellant constantly was aware of the cash needs and shortages of Allied. He found it necessary to make increasing demands upon Hoard's for more frequent check exchanges. There is overwhelming evidence that appellant was keenly aware of the overdraft status of Allied's account.
There is ample credible evidence from which the jury could conclude that appellant knew or should have known cash to be false or misleading. He admitted thinking it to be a little high when he first saw the balance sheet.
The statute is violated if the credible evidence shows, under the requisite burden of proof, that either of the following occurred: (a) Appellant should have known cash to be misleading, (b) appellant should have known cash to be false, (c) appellant knew cash to be misleading, or (d) appellant knew cash to be false. It is unnecessary to consider any but the easiest to prove, since only one count was charged and only one verdict submitted to the jury.
The facts just stated above relate to the appellant's knowledge. It is also interesting to note exhibit 43. This exhibit shows that Allied had substantial overdrafts on March 25th through March 30th, and again on April 2d through April 6th. Only on the crucial date, March *174 31st, and the following date did Allied have a positive book balance.
Exhibit 44 shows that from January 31, 1963, through September 30, 1964 (twenty-one months), on only three-month ends did Allied's general account have a positive book balance. One of these was March 31, 1964. Only on that one date was the total of all Allied's accounts a positive one.
Exhibit 53 shows the checks issued by B & W and Allied to Hoard's from January 1, 1964, to April 30, 1964. B & W issued three checks to Hoard's on January 6, 1964. After that Allied issued all checks back to Hoard's except $175,000 worth issued by B & W March 26th, 30th, and 31st. B & W again issued some checks at the end of April. It is significant that Allied did not drain its account in the last few days of March but that B & W repaid Hoard's. This allowed Allied's general account to increase by the amount of $175,000 from the Hoard's checks deposited in that account.
Finally, exhibits 54 and 55 show the net effect of the transactions between the several accounts in March and April. In March, Allied received $422,138 more from Hoard's, B & W, and NAW than it paid out, but in April it paid out $193,091 more than it received.
On the basis of the testimony and the exhibits the jury could conclude that there was a very carefully contrived scheme to inflate Allied's account for the crucial March 31st date. Appellant signed all checks of B & W and NAW.
The accountants all testified that cash was false and misleading. This was because the two B & W checks ($118,000) should not have been considered cash since the B & W account was related to Allied and was in an overdraft position and because one check was dated April 1st; because the three NAW checks ($50,000) were written on an overdrawn related account and because two were dated April 1st; and because the Industrial *175 Credit check ($100,000) was dated April 1st. All of which resulted in the inflation of Allied's cash account.
Only appellant's assertions stand against this evidence. It is irrelevant that Allied had assets which could have been encumbered or converted into cash. The investor has a right to accurate information which he may rely on completely or ignore, as he pleases.
Checks are not cash on March 31st when dated April 1st. That the checks were paid at a later date does not change the fact.
As Professor Blakely testified, Allied had a perfect right to end its fiscal year on any date it chose. That is a business decision. Once that decision is made, however, the company must present a true picture of its financial status as of that date.
An investor might look at the balance sheet Allied presented and one with the items complained about listed as receivables due, or due the next day, and conclude that that would make no difference to him. Another investor might see a negative cash account and refuse to consider investing in such a venture. These are investment decisions to be made by the investor free from false or misleading information furnished by the officers of the corporation.
We are of the opinion that the evidence amply supports a finding that the appellant violated the statute.
Appellant attacks the instructions of the court to the jury on (1) materiality, (2) false, (3) misleading, (4) knowledge, (5) exercise of ordinary care, (6) conspiracy, and (7) also the form of the verdict.
Appellant states that the purpose of the Blue Sky Laws is to protect the investment-buying public. Thus, the materiality instruction should have been in terms of whether the cash item was important to a potential investor.
The statute requires the false or misleading representation to be of a material fact.
*176 In the instruction given, the court stated:
"If you find, beyond a reasonable doubt, that this balance sheet was submitted by the defendants for the purpose of obtaining permission to issue stock of Allied Development Corporation to the public, then the cash item must be found by you to be material to the question of whether or not permission to issue stock should be given by the Wisconsin Department of Securities, or to the question of whether or not a prospective purchaser should purchase such stock."
Appellant argues that this amounted to a directed verdict on one element of the crime. The state argues that materiality is always for the court.
Without regard to whether materiality is for judge or jury, it can be said in this case that the court did not commit prejudicial error because additional instructions on materiality clarified the portion defendant complains about.
"In order for the statement to be material, it must have some weight and reference to the determination of either of those two questions [permission to issue and prospective purchase]. If the cash item on the balance sheet was relevant to the question of whether or not the Department of Securities would allow Allied Development Corporation to issue public stock, then it is a material statement. If the cash item was relevant to the issue of whether or not a purchaser would purchase such stock, then it is a material statement.
"The test of materiality is whether a false or misleading statement could influence the Wisconsin Department of Securities or a prospective purchaser, not whether it does in fact do so. The degree of materiality is unimportant."
The instruction taken as a whole is not an erroneous statement of the law and the ultimate determination of whether the cash item in the balance sheet was material was left to the jury.
*177 The court's instruction defining "false" is criticized as not relating to the overall profitability of the business as it appears to a reasonably prudent investor.
The instruction given was:
"False means `not true, erroneous, incorrect.' A written statement is made false not only by reason of what it stated, but also by reason of what it omitted to state, or what is concealed or implied."
The appellant's argument goes to materiality not falsity. We deem the instruction an accurate definition of "false" and not erroneous.
The instruction as to "misleading," as set forth by the appellant, is as follows:
"Therefore, you must find, beyond a reasonable doubt, that the cash item on the balance sheet is misleading to either the Wisconsin Department of Securities or to any prospective purchaser of Allied Development Corporation stock. It need not be misleading to both groups of persons."
We find nothing erroneous in this instruction. The court instructed the jury as to "knowledge":
"If you find, beyond a reasonable doubt, that either defendant, or both defendants, were actively engaged in the management and domination of the affairs of Allied Development Corporation, then either or both of them, as you so find, are chargeable with knowledge of its financial condition."
This instruction is not a directed verdict on knowledge that the statement was false, as appellant contends. There were separate specific instructions on knowledge that the cash item was false. This instruction is on the general financial condition of Allied. The jury had to determine that appellant was familiar with the overall financial condition of Allied before it could determine whether or not he should have known cash to be false or *178 misleading. The instruction was related to the other negligence instructions and was correct.
The court had instructed immediately prior to this instruction"Knowledge may be inferred where the lack of knowledge consists of ignorance of facts which any ordinary person under similar circumstances should have known."
This was the context of the instruction, and in that context it was correct.
A broader statement was labeled "perhaps too broad" in Hobbins v. State (1934), 214 Wis. 496, 516, 253 N. W. 570, but was not termed erroneous.
The statement of the law as instructed here was accepted in Matter of Filardo (1936), 221 Wis. 589, 603, 267 N. W. 312, and Schroeder v. State (1933), 210 Wis. 366, 375, 244 N. W. 599, 250 N. W. 185, certiorari denied, 289 U. S. 757, 53 Sup. Ct. 789, 77 L. Ed. 1501.
The statute (sec. 189.19 (2) (d) ) provides: "... which statement or representation he knows or in the exercise of reasonable care should know to be false or misleading."
The appellant argues that the court should have instructed that appellant should not be held to the standard of care of a certified public accountant.
The instructions on negligence were typical of those given and approved by this court. Wis J ICriminal, 375. They included the following statement:
"Negligence may also be said to mean a want of, or failure to exercise, that care and caution which a person of ordinary intelligence and prudence usually exercises in a like or similar situation, work or operation, under like or similar circumstances."
This is not an erroneous statement and does not hold the appellant to the knowledge and standards of a certified public accountant.
The appellant quotes an excerpt of the instruction on parties to a crime as defined by sec. 939.05, Stats. The *179 entire instruction as given is taken from Wis J I Criminal, 400, and defines the alternatives encompassed in the statutory definition of parties to a crime. We deem the entire instruction as given is not an erroneous statement of the law and was not prejudicial to the defendant under the facts of the case. The reference to any other crime is superfluous but not prejudicial.
The instructions criticized by the appellant are, in the main, portions taken out of context. We have carefully considered all of the instructions given to the jury by the trial court and conclude that, taken as a whole, they are not erroneous or prejudicially unfair to the appellant.[4]
The appellant also contends that the form of the verdict was erroneous. The form providing for a finding of guilty was as follows:
"We, the Jury, find the Defendant, Neil A. Woodington, guilty of filing a false or misleading statement as charged in the Information."
The jury was instructed that the verdict returned must be unanimous.
The appellant argues that the jury could have returned a verdict upon four possible theories: (1) Knowingly filing a false statement, (2) knowingly filing a misleading statement, (3) negligently filing a false statement, and (4) negligently filing a misleading statement; and that it is possible that all twelve jurors did not agree upon any one theory.
The appellant was charged with but one count in the informationa violation of sec. 189.19 (2) (d), Stats.
The statute provides for the penalty if the defendant did, "File or cause to be filed with the department any *180 statement or representation of a material fact, which statement or representation he knows or in the exercise of reasonable care should know to be false or misleading."
We are of the opinion that the proof in the record amply supports the verdict under all of the propositions or theories set forth by the appellant. The statute condemns the conduct when the defendant "knows" or the lesser standard of "in the exercise of reasonable care should know." If one or more of the jurors were convinced beyond a reasonable doubt that the defendant in the exercise of reasonable care should have known, and the balance of the jurors were convinced by the same degree of proof he did actually know, the defendant cannot complain. If a juror was convinced the appellant knew, his verdict is not inconsistent with his fellow juror who was convinced that in the exercise of reasonable care he should have known.
The words "false" and "misleading" within the context of the statute are both designed to prevent deception. While the words "false" and "misleading" taken out of context and examined separately might have slightly different meanings, we believe that they should be read together so as to encompass the prohibited act of deception. In any event, the testimony of all three accountants who testified stated the cash was both false and misleading.
The statute contemplates but one crimedeception in the issuance of corporate stock to the public. It was not error to submit the verdict in the form used by the trial court.[5]
The appellant asserts that sec. 189.19 (2) (d), Stats., should be declared unconstitutional and void because of the vagueness of its provisions. He particularly attacks the portions of the statute that permit a conviction for a want of reasonable care and the filing of a material *181 statement that is misleading. The statute, again, is as follows:
"(d) File or cause to be filed with the department any statement or representation of a material fact, which statement or representation he knows or in the exercise of reasonable care should know to be false or misleading."
We approach the problem faced with "the strong presumption of constitutionality of the statute,"[6] and with the acknowledgment:
"These statutes are part of ch. 189, Stats., the Wisconsin Securities Law, the purpose of which is to protect the public by preventing the sale of worthless and fraudulent securities. Klatt v. Columbia Casualty Co. (1933), 213 Wis. 12, 250 N. W. 825; State v. Rogers (1937), 226 Wis. 39, 275 N. W. 910. The several sections must therefore be considered in the light of that fundamental purpose." State v. Eisbach (1953), 263 Wis. 554, 556, 557, 57 N. W. (2d) 725.
The appellant, through counsel, argues the question of void for vagueness at length and from several concepts. Without discussing the various detail presented, we deem the controlling issue to beIs the statute read as a whole so indefinite and vague that an ordinary person could not be cognizant of and alerted to the type of conduct, either active or passive, that is prohibited by the statute?
"It has often been held that a criminal statute must be definite enough to inform those who are subject to it as to what acts will render them liable to its penalties. Lanzetta v. New Jersey (1939), 306 U. S. 451, 453, 59 Sup. Ct. 618, 83 L. Ed. 888; Connally v. General Construction Co. (1926), 269 U. S. 385, 391, 46 Sup. Ct. 126, 70 L. Ed. 322. See Unconstitutional Uncertainty An Appraisal, 40 Cornell Law Quarterly (1955), 195, 196." State v. Givens (1965), 28 Wis. (2d) 109, 115, 135 N. W. (2d) 780.
*182 The state, through the legislature, in the proper exercise of its police power, sought to regulate the sale of corporate securities so that the public will not be economically victimized by false or misleading information. The fact that the record may not contain sufficient proof to show that any person was deceived or misled is not controlling. We are not, at this stage, concerned with the sufficiency of the proof but rather the validity of the statute.
In keeping with this purpose the legislature has required that before securities of a corporation can be offered for sale to the public generally (except exemptions not material here), such securities must be registered by the department of securities under the conditions and safeguards set forth in ch. 189, Stats.
We have no hesitancy in concluding that no average person seeking registration of securities for the purpose of sale to the public could be unaware or confused as to the prohibitions of sec. 189.19 (2) (d), Stats. The statute, with ample clarity, advises him that he cannot seek registration or offer securities for sale if he in fact knows of the falsity or misleading nature of a material statement or representation in connection therewith. The statute advises him with equal clarity that he is obligated to use ordinary care to determine the falsity or misleading character of material statements or representations. Because of the legislative concern for the welfare of the public, the burden imposedto exercise ordinary careis neither ambiguous, uncertain, nor unfair. Where the substantial protection of the public welfare is concerned the legislature can, in the proper exercise of the police power, constitutionally prohibit, by criminal statute, negligent conduct which would be detrimental to this public interest.
Whether the material statement be false or misleading, the legislative purpose is clearno one shall either knowingly or negligently deceive the department or the public. No average person can be heard to say that he does not so understand the language of the statute.
*183 The appellant's attack on the statute is more that he should not have been found guilty under the statute rather than that the statute is too indefinite to be fair. He is really arguing burden of proof more than unconstitutionality.
Both the appellant and the respondent have cited a multitude of cases. To discuss them would only prolong an already lengthy opinion.
Authoritative relevant cases that uphold statutes challenged as "void for vagueness" are Commonwealth v. Reilly (1924), 248 Mass. 1, 142 N. E. 915; United States v. Gambling Devices (1953), 346 U. S. 441, 74 Sup. Ct. 190, 98 L. Ed. 179; United States v. Cardiff (1952), 344 U. S. 174, 73 Sup. Ct. 189, 97 L. Ed. 200; United States v. Spector (1952), 343 U. S. 169, 72 Sup. Ct. 591, 96 L. Ed. 863; Boyce Motor Lines, Inc., v. United States (1952), 342 U. S. 337, 72 Sup. Ct. 329, 96 L. Ed. 367; Jordan v. De George (1951), 341 U. S. 223, 71 Sup. Ct. 703, 95 L. Ed. 886; United States v. Ragen (1942), 314 U. S. 513, 62 Sup. Ct. 374, 86 L. Ed. 383; Winters v. New York (1948), 333 U. S. 507, 68 Sup. Ct. 665, 92 L. Ed. 840.
Because of the nature of the crime for which the appellant stands convicted, the sentence imposed, and other apparent ramifications of the case, we have reviewed the entire voluminous record, briefs, and argument of counsel for both the appellant and the state in detail and with care. The appellant is in his own right a learned attorney. He was represented by highly competent counsel who have pursued most diligently and thoroughly his defense at trial and review in this court. We conclude that he did have a fair trial and that credible evidence in the record amply supports the jury's verdict of guilty under a constitutional statute. The sentence imposed, upon the record before us, seems quite severe but that fact does not go to the merits of the conviction.
By the Court.Judgment and orders affirmed.
*183a The following memorandum was filed July 27, 1966.
PER CURIAM.
Appellant argues, on motion for rehearing, that he is entitled to a new trial because of the probability that the jury was influenced by the pretrial publicity initiated by the attorney general and others and discussed in the opinion.
On the appeal, appellant sought dismissal on the ground that "it is obvious that a repetition of this behavior [by agents of the state] can be deterred only if its consequence is a total denial of prosecution" and "In effect and in spirit, albeit not formally, the State's conduct adds up to an executive `Bill of Attainder'."[1] He said:
"Appellant is not relying upon a prejudicial pretrial publicity rationale, such as that urges [sic] in State v. Nutley, 24 Wis. (2d) 527, 129 NW (2d) 155 (1964); Irvin v. Dowd, 366 US. 717 (1961); Rideau v. La., 373 U.S. 723 (1963). In those cases, the courts were concerned with the impact of the content of certain pretrial publicity upon the ultimate trier of fact. The focus was solely upon the content of the material rather than its source. Our focus is solely upon the source, i.e., agents of the state, and particularly the Attorney General."[2]
He failed to ask the trial court for change of venue or continuance, or for a new trial on the specific ground of prejudicial pretrial publicity.[3]
He failed to include a transcript of the voir dire examination of prospective jurors in the record on appeal, although he now tells us a record was made and transcribed, that he has furnished it to our clerk, and that it *183b shows that only three of the prospective jurors "indicated that they were not aware of the pretrial publicity."[4]
We consider that appellant, in presenting his appeal, argued only, on this aspect of the case, that because the pretrial publicity instigated by the state's agents might tend to deprive him of a fair trial, the case should be dismissed in order to discipline the state's agents, but chose not to attempt to convince us of the fact nor the probability that such publicity did influence the jury, so as to entitle him to a new trial.
Appellant calls our attention to Sheppard v. Maxwell, decided June 6, 1966, 384 U. S. 333, 86 Sup. Ct. 1507, 16 L. Ed. (2d) 600, and points out that it was decided only one day before this case. We see nothing in Sheppard which should impel us to review on rehearing a claim in which appellant had so little confidence that he failed to move for continuance or change of venue, failed to move for a new trial on such ground, failed to include a transcript of the voir dire in the record, and failed to argue at the appropriate time.
We decline to review this claim which has been raised for the first time on motion for rehearing.
The motion for rehearing is denied.
Appellant filed a separate motion, seeking review and modification of the sentence imposed. In essence this is also a motion for rehearing, but upon a ground not even hinted at in the briefs on appeal. We did say in the opinion that the sentence "seems quite severe," but by no means went so far as to characterize this as one of the "rare" cases where "an abuse of discretion clearly appears" so as to overcome our "strong policy against interference with the discretion of the trial court in passing sentence . . . ."[5]
This motion is also denied.
NOTES
[*] Motion for rehearing denied, without costs, on July 27, 1966.
[1] American Bar Association (1957), Opinions of Committee on Professional Ethics and Grievances, Opinion 199, pp. 400, 401, concerning Canon 20, states:

"The Attorney General is the executive head of the Department of Justice of the United States. 5 U. S. C. A. § 291. He and his subordinates are the legal representatives of the United States in all proceedings, both civil and criminal, in the courts of the United States in which the United States is a party or has an interest. 5 U. S. C. A. §§ 309, 310, 315, 316. In a broad aspect the Attorney General is attorney for the body politic. Therefore, in publishing his reports and in issuing public statements for dissemination through ordinary news channels, he is reporting to the public. Herein lies a material difference between a report or a press release issued by the Attorney General and one given out by an attorney for a private client. Notwithstanding this difference, certain limitations should be regarded in giving out press releases by the Attorney General respecting pending or prospective litigation in order that the rights of the defendants, both in criminal and civil prosecutions, be neither impaired nor prejudiced."
[2] We are cognizant of the fact that usually a record is not made of the voir dire examinations. However, in this instance the appellant was well aware of his claim that an impartial jury could not be obtained by virtue of his own pretrial motion to dismiss on that ground. Under these circumstances we deem he should have made a record of all or a part of the voir dire to preserve his claim.
[3] See sec. 956.03 (3), Stats.
[4] Willenkamp v. Keeshin Transport System, Inc. (1964), 23 Wis. (2d) 523, 127 N. W. (2d) 804; Field v. Vinograd (1960), 10 Wis. (2d) 500, 103 N. W. (2d) 671; Brunner v. Van Hoof (1958), 4 Wis. (2d) 459, 90 N. W. (2d) 551; Bobrowski v. Henne (1955), 270 Wis. 173, 70 N. W. (2d) 666; Kuklinski v. Dibelius (1954), 267 Wis. 378, 66 N. W. (2d) 169.
[5] See Hobbins v. State, supra, pages 514, 515, and cases cited therein.
[6] State v. Kerndt (1956), 274 Wis. 113, 79 N. W. (2d) 113; United States v. National Dairy Corp. (1963), 372 U. S. 29, 83 Sup. Ct. 594, 9 L. Ed. 561.
[1] Appellant's Brief, page 28.
[2] Appellant's Brief, pages 22-23.
[3] He did close his motion after verdict with a request for a new trial in the interest of justice "for all these reasons cumulatively." Although the quoted phrase can possibly be read as including, among many others, the complaint about the pretrial conduct of the prosecution upon which a motion for dismissal had been grounded, we do not view it as a sufficient specification of this as a ground for a new trial.
[4] Appellant's Brief in support of rehearing, page 23.
[5] State v. Tuttle (1963), 21 Wis. (2d) 147, 150, 124 N. W. (2d) 9.