STATE, Plaintiff, v. KELLY, Defendant.

*No. State 40.   Argued April 11, 1968.—Decided May 20, 1968.*
(Also reported in 158 N. W. 2d 554.)

For the plaintiff there was a brief and oral argument by *Rudolph P. Regez* of Monroe, counsel for the Board of State Bar Commissioners.

For the defendant there were briefs by *Lawton & Cates* and *Richard L. Cates* and *John C. Carlson,* all of Madison, and oral argument by *Richard L. Cates.*

PER CURIAM. The complaint in this proceeding was made and filed pursuant to sec. 256.28 (8), Stats. In substance, it alleges as follows:

Count 1: That Robert C. Kelly was found guilty in the circuit court for Dane county of filing a false financial statement with the Wisconsin Department of Securities in violation of sec. 189.19 (2) (d), Stats.

Count 2: That on the 11th day of February, 1964, Robert C. Kelly, being the president and director of the Madison American Guaranty Insurance Corporation, referred to hereinafter as MAGIC, did file, or cause to be filed, with the State Department of Securities, an audit report which was the part of a security-registration application which the defendant knew, or in the exercise of reasonable care should have known, to be false or misleading, in that it included assets not properly allowable as "admitted assets."

Count 3: That on or about the 25th day of February, 1964, Robert C. Kelly verified the annual report of MAGIC and filed, or caused to be filed, with the Wisconsin Insurance Department a report which he knew, or in the exercise of reasonable care should have known, to be false or misleading.

Count 4: That the defendant, as an officer of MAGIC, participated in the making of loans aggregating $300,000 and that such loans were made to conceal a violation of, and to evade, sec. 201.24 (4), Stats., prohibiting loans between affiliated corporations or related individuals.

Count 5: That the defendant participated with certain other officers of the company in illegally satisfying various satisfactions of mortgages when, in fact, MAGIC had received no repayment of the loans.

Count 6: That contrary to the Wisconsin conflict-of-interest statute, sec. 201.24 (4), Stats., the defendant as an officer of MAGIC participated with others in making substantial loans to the trustee of the Lumberman's Trust, notwithstanding the fact that the purpose of the trust

was a device which enabled MAGIC to make otherwise illegal loans.

This disciplinary action was commenced on July 21, 1967, and The Honorable J. K. CALLAHAN was appointed as referee. The hearing was conducted in November of 1967. The referee's findings were filed on January 16, 1968, and recommended that Kelly be reprimanded and ordered to pay the costs of the disciplinary action. Suspension was not recommended.

A perusal of the record in this case indicates that Robert C. Kelly is forty-four years of age, is married, and has three adopted children. He attended the University of Wisconsin Commerce School commencing in 1942, but his education was interrupted by three years in the United States Army, where he served as a combat paratrooper. After the war he returned to the University of Wisconsin and received a bachelor of science degree in 1949. He graduated with honors from the law school one year later, having taken an accelerated course which was offered immediately following the war. He was a member of Coif and ranked second in his class. Neil A. Woodington graduated number one. Upon graduation he was admitted to the bar on June 16, 1950, and thereafter accepted employment with one of Wisconsin's leading law firms. He was assigned to work primarily in the field of automobile negligence.

His experience as a practicing lawyer was comparatively short, for in 1951 his father-in-law, who was an officer of Hoard's Creamery, died. Kelly was asked by the board of directors of Hoard's to take the position of general manager, and he remained with that company until 1965. During this entire period, he did not hold himself out to be a practicing lawyer, nor did he practice law. His entire efforts were concentrated on the management of Hoard's and, subsequently, in the affairs of Allied Development Corporation and the Madison American Guaranty Insurance Corporation.

It is undisputed that during the period from 1952 to 1960 the growth of Hoard's under Kelly's direction was impressive. It is absolutely clear that during this period no misconduct of any kind was attributed to Kelly. On the contrary, the record in this proceeding is replete with evidence of exemplary conduct in his personal life and as a community and business leader.

By 1961 the liquid and uninvested assets of Hoard's exceeded $650,000, and it was decided by the board of directors of Hoard's to diversify their investments because of the increasing competition with large metropolitan dairies. At this time Neil A. Woodington, who had been an associate in the same law firm with Kelly during the period of 1950 to 1951, actively reentered Kelly's life, although they had been social acquaintances during the entire period. It is the contention of Kelly's counsel that from 1962 Kelly played Trilby to Woodington's Svengali, and it is contended that Kelly's subsequent difficulties concerning Allied and MAGIC were the result of Kelly's gullible acceptance of Woodington's false assurances and deceptions.

We do not in this opinion concern ourselves with the alleged malefactions of Woodington. Disciplinary proceedings are presently pending against him; and, since he has not been heard in regard to them, it would be inappropriate in these proceedings to make a judgment on the culpability of Neil A. Woodington or to label him as the seducing incubus. Woodington was called upon to testify in these proceedings, but, as is his right, he refused to testify. Nevertheless, Kelly's activities cannot be understood without some reference to the Woodington enterprises and Neil A. Woodington's activities.

It appears that about the same time Hoard's was looking for new outlets for its capital, Neil A. Woodington was looking for financing for his enterprise, the Allied Development Corporation. Basically, his proposal was to integrate all facets of real-estate development into one

company from the acquisition of unimproved land and raw materials to property sales and rental-property management.

Woodington prior to this time acquired, ostensibly, substantial interests in several real-estate-development companies, a lumberyard, and raw-material and construction-supply companies in Madison, Wisconsin. The "Allied Idea" contemplated consolidation of all these corporations into one corporation.

Woodington approached Kelly, who, in turn, submitted Woodington's proposition to the board of directors of Hoard's. The prospectus furnished by Woodington contemplated an initial capitalization of $1,000,000, one half of which was to be furnished from the assets of the Woodington-controlled corporations, the principal one of which was Brooks & Woodington, and the remainder was to be furnished in cash from Hoard's. Under the agreement entered into, Hoard's acquired capital stock in Allied in exchange for $250,000 in cash, with an option to purchase an additional $250,000 of stock. Simultaneously, Brooks & Woodington contributed property that was represented to be substantially the equivalent in value of the Hoard cash contribution.

As subsequently revealed when the bubble burst, the Brooks & Woodington property was subject to large undisclosed encumbrances. There were $53,000 in real-estate taxes that were unpaid, as well as certain mortgages. It was estimated at a later date that there were almost $250,000 in encumbrances on the properties transferred to Allied.

Allied commenced operations in June of 1962, and Kelly was elected secretary and was a member of the board of directors. During this first year, at least, Kelly took no active role in the management of Allied. He appeared at directors' meetings and met occasionally with Woodington but played no active part in the day-to-day affairs of Allied. He continued as the full-time manager of

Hoard's. Counsel for Kelly attributes much of Kelly's conduct to the fact that he was, initially at least, only a titular and not an active officer of Allied. During the first year of operations, primarily because of distorted financial statements which exaggerated the success of Allied's, Hoard's was induced to exercise its option for the additional $250,000 in stock; and Hoard's, either by direct loans or by underwriting loans made by Allied, was involved in the extension of credit to Allied in the amount of $550,000.

Kelly and his wife also lost substantial sums of money in the course of these operations. Kelly testified that he filed a claim in bankruptcy against Allied for $25,000 and also lost in excess of $61,000 in Brooks & Woodington. The claim is made that Mrs. Kelly lost over $200,000, but it appears that in part this is a duplication of Hoard's losses, since a part of her losses was reflected in the reduction in value of her interest in Hoard's.

It is thus apparent that by the end of 1963 the financial statements submitted to Hoard's and Kelly led them to believe that Allied was a reliable, growing, and successful enterprise, in which it appeared prudent to make substantial investments.

In the fall of 1963 Kelly, although continuing as a full-time manager of Hoard's, became active in Allied and was in charge of negotiations in regard to platting, zoning, and the obtaining of construction loans. One of his principal duties at this time was the liquidation of Brooks & Woodington in accordance with the original plan that the original Woodington companies would be completely replaced by their functional counterparts in Allied. After assuming these duties Kelly was paid a salary of $20,000 by Allied.

Simultaneously with the apparent success of Allied, another Woodington creature, MAGIC, was in the process of expansion. In July of 1962 Kelly was elected to the board of directors of MAGIC and was subsequently made

president. MAGIC actually started doing business in the fall of 1962. Woodington, although president of Allied, was vice-president of MAGIC. Woodington and the treasurer of the company were in charge of the financial aspects of the operation, and Kelly and the general manager had as their primary duties the soliciting of policy-holders and the handling of public relations. An investment committee was formed consisting of Woodington as chairman, Clarence Bylsma [1] as secretary and legal counsel, and Robert R. Paunack, a professional banker, as the financial adviser, and Kelly. This committee was charged with the study and recommendation of investments to the board of directors.

It is asserted that during the years 1963 and most of 1964 Kelly, although knowing that both companies were short of cash, believed that the assets were steadily growing and that both companies were in a sound financial situation.

The facade of the Potemkin village collapsed in August of 1964. At about this time MAGIC, as a prerequisite to doing business in other states, requested the approval of the Insurance Department. One of the examiners for the department found that certain mortgages held by MAGIC had been satisfied without the loans being, in fact, paid. Kelly was confronted with this fact, and he has testified that he had no prior knowledge whatsoever of this situation. It appears from the record that there is no reason to question his statement in this respect. Kelly immediately contacted Woodington, who was then in Europe, and asked that he return immediately to explain the situation.

The financial tangle of MAGIC's affairs led inexorably to a complete audit of Allied and the companies that were related to it under the control of Neil A. Wooding-

---

[1] Disciplinary proceedings are presently pending against Clarence Bylsma. It is not the intent of this opinion to pass judgment upon Bylsma's conduct.

ton. While it was alleged that the original investigation by the attorney general was political in nature, and no doubt political capital was made of the situation, it appears from the subsequent audit that the investigation was well warranted.

This investigation led to the discovery that a false financial statement signed by Kelly and Woodington on March 6, 1964, had been filed with the Wisconsin Department of Securities. This statement was filed as a requirement for the public issue of Allied capital stock. Allied's books had been audited by the accounting firm of Virchow & Krause, which prepared a balance sheet showing Allied's financial condition as of March 31, 1964. This statement was incorporated in a statement filed by Kelly and Woodington. The cash figure on the balance sheet, $224,356, is concededly false. As a consequence of the filing of this false statement Woodington and Kelly were charged with a violation of sec. 189.19 (2) (d), Stats., which provides:

"(2) Every director, officer, agent or employe of any issuer and every dealer, agent, investment adviser or other person shall be imprisoned in the state prison not exceeding 5 years, or in a county jail not exceeding one year, or fined not exceeding $5,000, or both, who shall directly or indirectly:

"(d) File or cause to be filed with the department any statement or representation of a material fact, which statement or representation he knows or in the exercise of reasonable care should know to be false or misleading."

Both Woodington and Kelly were found guilty. Woodington was sentenced to three years in the state prison, and Kelly was placed upon probation. The conviction of Woodington was subsequently affirmed by this court in *State v. Woodington* (1966), 31 Wis. 2d 151, 142 N. W. 2d 810, 143 N. W. 2d 753. Kelly did not appeal.

This disciplinary action was prompted by the conviction and other irregularities that were uncovered in the investigation.

Count one is the direct outgrowth of the criminal prosecution and alleges that Robert C. Kelly was convicted of filing a financial statement in regard to Allied with the State Department of Securities when he knew, or should have known, it to be false. As stated above, the cash figure was admittedly inflated. According to the accounting reports that are presently available to the court, that figure was false for several reasons.

The first reason for its falseness was the exchange of checks between Hoard's and Allied. It was the custom for Hoard's and Allied to exchange checks in equal amount. When a Hoard check was received by Allied, because of the admittedly high credit rating of Hoard's, the banks were willing to treat Hoard's checks, though uncollected, as the equivalent of cash. Checks drawn on Allied payable to Hoard's were, however, not so preferentially treated by Hoard's bank and were only treated as cash when the clearing process was completed. The effect of these transactions, although leaving the balance sheet totals untouched, was to show as cash the Hoard's checks though they were in fact not yet collected; and since, apparently, Allied's checks were not charged against whatever cash was on hand until collection, the effect of these transactions inflated the cash position of Allied.

There were also a number of instances in which Hoard's would hold Allied's checks for a period of a few days, thus further delaying any cash drain on the Allied bank account, although in fact the cash was obligated. In effect, Hoard's credit was being used to secure short-term loans for Allied. In the period from June 1962 to August 1964, there were $9,000,000 in checks thus exchanged. Kelly, as a manager of Hoard's, was aware of the check exchange. There were also other transactions wherein Hoard's would write a check to Allied, and the exchange check would come from Brooks & Woodington. This, of course, had the effect of increasing Allied's cash on hand and resulted in an indebtedness to Allied by

Brooks & Woodington. There were other three-cornered transactions that had the same effect.

On March 31, 1964, the day of the false financial statement, the account was inflated by reason of checks to Allied from Brooks & Woodington and from Neil Woodington. Some of these checks were in fact dated April 1st and should not, following sound accounting practices, have been shown on the March 31st financial statement. In addition there were checks that had been drawn on Brooks & Woodington when those accounts were substantially overdrawn. The showing of these checks as cash items falsely inflated the cash figure.

Moreover, the cash figure on that date included a loan from the Industrial Credit Corporation in the amount of $100,000 that was in fact not received until April 1, 1964.

The referee to whom this matter was assigned found as a fact that, although Robert C. Kelly participated in the check exchanges between Hoard's and the various corporations to the extent of about $9,000,000, he did not have knowledge of the falsity of the statement filed on March 31, 1964. We conclude that the referee's findings in that respect are supported by the evidence. It is clear from the record that Kelly had little or no accounting experience and had nothing to do with the accounting aspects of Allied and played no part in the preparation of the false statement. He testified that he failed to read the audit report before it was sent to the Wisconsin Department of Securities. It is essentially the position of Kelly that, although he knew of the exchange of checks between Hoard's and Allied and the other corporations, since these balanced off, nothing false would be reflected in the statement. He claims to have been unaware of the effect of these transactions on the cash position. While, in view of the positions of responsibility he had with both Hoard's and Allied, it is clear that he should have known what the effect of these transactions would be, there is nothing in the record to show that he was in fact aware of

the balance sheet distortion. Certainly, there was no evidence that he knew of the almost zero bank balances of Brooks & Woodington and of the fact that the $100,000 loan had not yet been received. We thus conclude that, although his conduct was highly negligent and in violation of the criminal statutes, it did not represent turpitudinous conduct in the sense that it constituted knowingly giving a false statement. However, it constituted unprofessional conduct.

Count two of the complaint charges Kelly with having filed, or causing to be filed, with the State Department of Securities a statement of MAGIC which defendant knew, or should have known, to be false or misleading, and Count three alleges a similar false filing with the Wisconsin Insurance Department.

We conclude the referee's finding that Kelly participated in a transaction with Clarence Bylsma which violated the conflict-of-interests statute, sec. 201.24 (4), Stats., is in accord with the evidence. The effect of this violation was to show as an asset property secured through a transaction with an officer of the company and, hence, not properly an admitted asset for insurance accounting purposes. In addition, the asset was carried as real estate, while in fact Bylsma conveyed only his encumbered interest as a land-contract vendor. We consider, in this disciplinary action, Kelly's participation in giving and accepting subterfuge conveyances to obfuscate the facts far more serious than the violation that is alleged to have occurred in misstating the assets. This transaction, referred to as the "Lumley Road Deal," resulted when Bylsma, the legal counsel for MAGIC, conveyed the Lumley Road property to MAGIC in exchange for 6,600 shares of stock.

This was an illegal transaction because it involved dealings between the corporation and its officers. Kelly was aware of the Insurance Department's conclusion that the transaction was a prohibited one. Nevertheless, with the

admitted knowledge of Kelly, MAGIC subsequently conveyed the property back to Bylsma by a deed dated November 5, 1963, eight months prior to the true date of the transaction. This deed was signed by Kelly as an officer of MAGIC. Bylsma then conveyed to a straw man, who in turn deeded the property to MAGIC. Kelly acknowledged that he was fully aware of the fact that the net result of the transaction would be to again convey the Bylsma-owned property to MAGIC. His feeble defense is that he had a right to rely on his legal counsel, Bylsma, who told him that the Insurance Department had no objection to these transactions.

It would be difficult to accept Kelly's interpretation of these transactions even if he were a nonlawyer. It requires no legal sensitivity or a plethora of moral awareness to know that what was accomplished by this transaction was a clear subversion of the intent of the statute and the Insurance Department's regulations. Kelly has himself now admitted that the transaction was "indiscreet." We conclude that this conduct was morally turpitudinous, since it could have as its only purpose the thwarting of the spirit of the law by concealing the true nature of a prohibited transaction, and it resulted in false financial statements that misrepresented the nature of the asset acquired.

Count 4 of the complaint charges that Kelly, as an officer of MAGIC, participated in making five loans aggregating $300,000. The essence of this charge is that Allied permitted certain "straw men" to take title to real estate owned by Allied which had a value of less than $5,000. These straw men—there were five of these transactions—then borrowed $60,000 from MAGIC, giving a note and mortgage. These straw men were not the final recipients of the $60,000. Rather, it appears that the cash went to Brooks & Woodington. Subsequently, these mortgages were satisfied without MAGIC being repaid. It appears that the purpose of this series of transactions

was to divert cash to the Allied Development Corporation and its related companies, thus inuring to the balance-sheet position of Allied and at the same time showing falsely valued assets in MAGIC's financial statements.

The essence of the state's argument was that Kelly must have had knowledge of these transactions, since he was a member of the investment committee which made the determination. A careful perusal of the record, however, reveals that the investment committee seldom, if ever, met. It is Kelly's statement, and it is uncontradicted in these proceedings, that he relied implicitly upon Woodington and upon Bylsma, the corporation's counsel, and upon Paunack, who was the financial adviser. It was these mortgages that first alerted the auditors of the Insurance Department that unwarranted financial manipulations had occurred in the MAGIC-Allied complex of corporations. It was these mortgages that were called to the attention of Kelly when Woodington was out of the country. The Insurance Department witness who confronted Kelly at that time acknowledged that Kelly was shocked and appeared to be completely unaware of these transactions. There is not one scintilla of evidence to associate Kelly with any of these transactions.

We conclude that the referee's finding that Robert C. Kelly had no knowledge of these transactions accords with the evidence. This conclusion is made even more tenable by virtue of the fact that the effect of these transactions, in part, was to siphon money from MAGIC into Brooks & Woodington, a corporation in which Kelly had no interest. This particular transaction was very much contrary to Kelly's pecuniary interests. Nevertheless, the management of MAGIC, including Kelly, had been advised in a conference with their accountants on October 4, 1963, of the dubiousness of certain investment policies. Moreover, the board of directors of MAGIC passed a resolution establishing investment guidelines. These straw-man mortgages were clearly in violation of

the admonitions of the accountant and of the investment resolution of the board of directors. Nevertheless, the straw-man mortgages were made shortly thereafter.

While the state concedes that Kelly had no actual knowledge of these illegal transactions, it is apparent that his failure to know constituted negligence on his part. While such negligence shows an unwarranted willingness to let others assume the responsibility for decisions that were his, and is deserving of a reprimand, we cannot conclude, in light of Kelly's lack of actual knowledge, that his conduct was turpitudinous. There is also no evidence to show that Kelly in any way knew that these mortgages were satisfied when in fact the money was still owing to MAGIC. The referee's finding in respect to Count 5 is supported by the evidence.

Count 6 alleged that Kelly as an officer of MAGIC participated in making substantial loans to the trustee of Lumberman's Trust when such loans were contrary to the Wisconsin conflict-of-interests statute, sec. 201.24 (4), Stats. Lumberman's Trust was a device used to secure financing for at least three of the Woodington corporations—West Park Development, Greentree Estates, and Brooks & Woodington. These corporations were the owners of $500,000 in stock of Allied Development. These shares were assigned to the American Exchange Bank of Madison as the trustee of what was denominated as Lumberman's Trust. An investment in Lumberman's Trust made it possible for the trustee to loan the cash to the Woodington corporations which were the creators of the trust. The Wisconsin Insurance Department in its report for the period ending August 31, 1964, criticized MAGIC's investment in Lumberman's Trust. Nevertheless, subsequent to the warning, MAGIC loaned Lumberman's Trust a total of $22,250, although Kelly knew that similar investments were improper under the circumstances. It appears from the Insurance Department's report dated September 25, 1964, that some $99,500 had been invested in Lumberman's Trust. Be-

cause of the limitation imposed by statute for such investments, the Department advised MAGIC that only $96,123.40 of the investments could be treated as an admitted asset. The additional investments of $22,250 nevertheless followed.

It is Kelly's defense that he and the investment board were initially advised by counsel, Clarence Bylsma, that investments not exceeding 10 percent of the company's assets were permitted. However, it appears in the record that, at the time of the Insurance Department's admonition, more than the allowed amount was in fact invested. Nevertheless, Kelly participated in the investment of an additional $22,250. He states, and it is without contradiction in the record, that Woodington told him that the Insurance Department had authorized MAGIC to maintain its investment at the then present level even though it exceeded 10 percent of the admitted assets. He further testified that Woodington told him that the three checks were necessary to maintain that level. It was the finding of the referee that Robert C. Kelly, subsequent to being advised as to the impropriety of these investments, paid a forfeiture to the State Insurance Department for a violation of the conflict-of-interests statutes and that he also subsequently invested money of MAGIC in Lumberman's Trust in excess of the prescribed limits, but that he did so on the written opinion of his attorney. This finding is supported by the evidence to the extent that the initial investment had the approval of Bylsma and the subsequent investments were made upon the assurances of Neil A. Woodington. Although Kelly's present counsel questions the illegality of these transactions, his defense is premised on the theory that, even if they were, Kelly was misled. The facts substantiate this latter argument, and the record is devoid of any evidence that would prove intentional culpability. Yet it is difficult to imagine that Kelly, a man of great accomplishments as a student of the law and as

a successful manager of a prosperous corporation, could be so naive as to rely upon such advice when a similar transaction had already embroiled MAGIC and Kelly personally in a forfeiture. Although it appears that Kelly's conduct was not intentional in this respect, his failure to make reasonable inquiries beyond those that he did make—for example, he could have inquired of the Insurance Department directly—constitutes a serious breach of his stewardship as a principal officer of an insurance company.

The testimony revealed, and the referee found, that after the tangled affairs of Allied and MAGIC came to light Robert C. Kelly wrote letters to stockholders of both MAGIC and Allied Development which the state contends were calculated to lull the stockholders and the public into thinking that there was nothing wrong with the affairs of those companies when, in fact, at that time Kelly knew that there were serious difficulties. We have not in our deliberations on this matter given any consideration to these charges, which were not incorporated in the complaint, and we therefore conclude that these charges that Kelly wilfully concealed the true state of affairs from the public and from stockholders are not properly before this court. *In re Ruffalo* (April 8, 1968), 390 U. S. 544, 88 Sup. Ct. 1222, 20 L. Ed. 2d 117. However, it is the conclusion of this court that Robert C. Kelly's course of conduct in other respects constitutes unprofessional conduct. He seeks to excuse much of this conduct on the basis of advice given by others. The record is uncontradicted that he relied on his associates when, it is now obvious, that such reliance was unwarranted. However, a perusal of the record makes it substantially clear that no man who holds himself out to be a lawyer should have placed continued reliance upon these representations. While it is undisputed that Kelly had no actual knowledge of the falseness of the financial statements filed, it is contrary to common sense to conclude

that he did not know that these transactions would inevitably be reflected in a balance-sheet distortion. In the Lumley Road transaction Kelly knew that the transaction as originally devised was in violation of the conflict-of-interests statute. Yet he participated in a scheme where the substance of the transaction remained the same. In the Lumberman's Trust transactions he chose to bury his head in the sand and to continue to rely on advice that had already got him in trouble.

His participation in each of these transactions is inconsistent with the obligations of an attorney who is obliged to follow the law and not to seek pettifogging excuses to evade it. On the other hand, it is apparent that the big losers in this whole debacle were Kelly and his wife and his long-time friends and associates at Hoard's. Much of what was done appears to have been a deliberate attempt to siphon the Hoard's money into enterprises in which Kelly had no interest.

A persuasive argument is made by Kelly's counsel that Kelly was a victim from start to finish. There is evidence, such as the initial misleading balance sheet that induced the investment of Hoard's money, that tends to substantiate this theory; but there came a point when Kelly, through volition or otherwise, left the sheep and joined the wolves. Any reasonable man, particularly one of Kelly's admitted ability, must have realized at some time before the whole scheme was exposed that the entire project was likely to go down the drain, together with the investment of Hoard's and Kelly. To any reasonably prudent man the atmosphere was foul long before the Insurance Department questioned the financial statements. Kelly's conduct in conniving in questionable transactions, ignoring the admonitions of the Insurance Department, and continuing to follow what had already proved to be bad advice can only be explained by the desperate hope that all was not lost and that, in some way, the investments of Hoard's and those who had been

lulled into making these investments by Kelly and Woodington would somehow be saved if time could be bought with illegal credit and accounting statements that reflected something less than the whole truth.

This court considers Kelly's conduct, irrespective of how he initially embarked on this venture, to be highly reprehensible. We are satisfied that disciplinary action is warranted. While a part of the function of a supreme court in exercising control over attorneys is for the purpose of discipline of the offender and as a deterrent to others, it is also concerned with rehabilitation. We consider Robert C. Kelly to be worthy of the opportunity to rehabilitate himself and after suspension to continue in the practice of law. His record as a lawyer and businessman prior to this affair was above reproach. The record is replete with letters from citizens of Fort Atkinson whose judgment we respect highly commending him on the basis of his past record. He has on numerous occasions, and uniformly until he became involved in this affair, proved himself to be a man of high character and honor. Kelly saw fit not to appeal his conviction for the filing of a misleading financial statement. Some of the expert witnesses at that trial concluded that Kelly would not have been found guilty had he been tried alone. The able trial judge who pronounced sentence stated, "My heart bleeds for you." Kelly was given the opportunity to plead guilty to a misdemeanor but chose to plead not guilty because he believed himself completely innocent. As a result of the conviction, Kelly was unemployed for some months and was obliged to rely on unemployment compensation for the support of himself and his family. It is also significant that, because of his inability to pay legal fees necessary for his defense, he was asked by the firm representing him if he were willing to do legal work in payment of these fees. The partners of that firm, a firm of high repute, have testified to what the record already shows—that Robert C. Kelly

is a lawyer of great ability. They additionally testified to the fact that they believe that his basic character would permit him to be an ornament to the legal profession rather than a detriment to it and that they intend to continue his employment. We have the highest confidence in these character references; and because we believe that the manipulations in which Kelly was involved represent not his true character but an aberration from it, we herein impose what, under the circumstances of the conduct alone, is mild disciplinary action. His course of conduct since his conviction, and the contrition he has shown, convinces us that his rehabilitation is substantially complete. We take into consideration the penalty that has already been imposed upon him as the result of the criminal prosecution. We conclude that the conduct of Robert C. Kelly was unprofessional and, in the respects stated, morally turpitudinous.

Therefore, it is ordered and adjudged that the license of the defendant, Robert C. Kelly, to practice law be suspended for a period of six months from the date of the entry of judgment herein and thereafter until reinstatement; that a portion of the costs of these proceedings to the extent of $5,000 shall be taxed and charged to the defendant and that the entire sum thereof shall be payable not later than two years subsequent to the entry of the judgment, that after the expiration of five months from the date of the entry of judgment herein the defendant may apply for reinstatement of his license to practice law upon compliance with Rule 10, section 6, State Bar Rules.

WILKIE, J., took no part.